In the Matter of DAYLIGHT TRANSPORT, INCORPORATED, Debtor.

**Bankruptcy No. 182–11073(11).**

United States Bankruptcy Court, E.D. New York.

March 26, 1984.

Ballon, Stoll & Itzler, New York City, for debtor.

Stroock, Stroock & Lavan, New York City, for Creditors' Committee.

Alfred A. Rosenberg, Brooklyn, N.Y., former atty. for debtor and pro-se.

Todd M. Breen, Officer of debtor.

Weber, Lipshie & Company, CPA's for debtor.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Louis B. Rosenberg, Esq. has moved this court for reconsideration of the fee allowed him by the Court as attorney for the debtor and debtor-in-possession in this Chapter 11 proceeding. He was allowed $15,000.00 for the reasons stated in the record at the hearing on October 28, 1983. He had requested $130,000.00.

The Debtor, Daylight Transport, Incorporated ("Daylight") is engaged in the airfreight forwarding business. It is a relatively small company. Its assets, if liquidated, would bring less than $1,400,000.00. In order to fund its plan the debtor is borrowing $125,000.00 from Manufacturers Hanover Trust. Under its plan general unsecured creditors will receive 43 percent of their claims upon confirmation, 3½ percent one year after confirmation and 3½ percent two years after confirmation.

Daylight's expenses during the Chapter 11 proceeding for lawyers and accountants have been very heavy for reasons which will be developed hereinafter.

At the same time as the Court awarded $15,000.00 for services to Mr. Rosenberg it awarded $40,000.00 as fees to the attorneys who had replaced him as counsel to the Debtor, and $76,000.00 to the attorneys for the Creditors' Committee.

## THE APPLICABLE LAW

There is probably no task which a bankruptcy judge is asked to perform which is more disagreeable than the necessity for reviewing and reducing, when necessary, the fees requested by attorneys and other professionals. The task is doubly unpleasant where a leader of the bar, like Mr. Rosenberg, is involved and the Court feels compelled to disagree with the value he places on his services.

But unpleasant as is the task of monitoring fees in insolvency proceedings, it is one from which a conscientious bankruptcy judge cannot shrink nor abstain since the supervision of professional fees is essential to the operation of the bankruptcy laws, integral to the bankruptcy system and required by the Bankruptcy Code.

The assets of any company constitute a trust fund for its creditors. Where those

assets are insufficient to satisfy the claims of those creditors, whatever the debtor pays his attorneys reduces the amount available to creditors. When a debtor faces liquidation, therefore, it is important to review the amount he has undertaken to pay his attorneys to make sure he has not been profligate at their expense. But supervision is no less important where the debtor's goal is rehabilitation of its business through a reduction in its total indebtedness.

■ It is as true of Chapter 11 as it was of Chapter X under the predecessor statute that,

"... a depletion of the cash resources of a debtor's estate may have a severe effect both on the fairness and feasibility of a plan of reorganization, and that any determination by a court of the fairness and feasibility of a plan must logically include as one of its components a determination of the fairness and reasonableness of the amounts paid as fees and expenses of those participating in the reorganization case." *Matter of R. Hoe & Co., Inc.*, 471 F.Supp. 493, 499 (S.D.N.Y.1978).

The creditors and the debtor are both interested in ensuring that the fees for attorneys and other professionals do not drain the estate. First, to the extent that professionals are overpaid, less is available to creditors; second, excessive expenses may jeopardize the debtor's rehabilitation. These interests are recognized in the bankruptcy laws. Attorney's fees are the subject of several sections of the Bankruptcy Code and a number of the Rules of Bankruptcy. Attorneys who represent a debtor in any capacity are required to disclose their fees and if their compensation exceeds the reasonable value of their services, they may be compelled to relinquish the excess to the estate (Sections 328, 329, Bankruptcy Rules 219(b), 220 (now replaced by Bankruptcy Rule 2016(b))); any sharing of compensation between attorneys is flatly prohibited (Section 504); no attorney may be employed by a debtor without authorization from the Court (Section 327;

Bankruptcy Rule 215 (now replaced by Bankruptcy Rule 2014)); all creditors must receive notice of the fees requested by the debtor's attorneys to be paid out of the estate and must be given an opportunity to be heard on the reasonableness of such fees. (Sections 330, 503(b)(2), Bankruptcy Rules 203, 217(a) (now replaced by Bankruptcy Rules 2002(a), 2016(a))).

Section 330 provides in relevant part as follows:

"(a) After notice to any parties in interest ... and a hearing ... the court may award ... to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such ... attorney ... based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses."

■ Except that the Code rejects the concept that notions of economy shall govern the allowance of attorneys fees in bankruptcy cases, the criteria developed under the Bankruptcy Act continue to be applicable. See, e.g., *Matter of Hamilton Hardware Co., Inc.*, 11 B.R. 326 (Bkrtcy.E.D.Mich.1981); *In re Garland Corp.*, 8 B.R. 826 (Bkrtcy.D.Mass.1981); *In re J.R. Elkins*, Bankr. No. 181–12593–21, Unreported Decision (Duberstein, B.J.) (B.C. E.D.N.Y. Nov. 17, 1983); 2 *Collier on Bankruptcy*, ¶ 330–05[2] (15th Ed.1980). They include: (1) the nature of the services rendered; (2) the difficulties and complexities encountered; (3) time necessarily expended; (4) the results achieved; (5) the burden the estate can safely bear; (6) the size of the estate; (7) duplication of services; (8) professional standing, ability and experience of the applicant; and (9) fairness to each applicant. *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir.1959); *In re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir.1958); *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir.1977).

In insolvency proceedings, as in other areas, a lodestar figure is often computed by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980); *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (Bankr. App. Panel 1st Cir.1982). For the determination of such a figure adequate time records are indispensable. *In re Hudson & Manhattan Railroad Co.*, 339 F.2d 114 (2d Cir.1964); *In the Matter of Wal-Feld Co., Inc.*, 345 F.2d 676 (2d Cir.1965); *Matter of R. Hoe & Co., Inc.*, 471 F.Supp. 493, 501 (S.D.N.Y.1978). In *In re Hudson & Manhattan Railroad Co., Inc., supra*, the Second Circuit said: "[A]ny attorney who hopes to obtain an allowance from the Court should keep accurate and current records of work done and time spent ... there is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported by daily records, or for it to expect the Court to do so."

That no time records were kept does not forfeit the right to any compensation. Where good cause exists for the non-production of such records, the bankruptcy judge may rely upon some alternate form of proof, including reconstructed records. *In re Meade Land & Development Co., Inc.*, 527 F.2d 280, 283–84 (3d Cir.1975). But since the burden of proof lies on the applicant, any doubts as to the reliability of reconstructed records should be resolved against the applicant.

As Bankruptcy Judge Bartels noted in a civil rights case:

> While the use of reconstructed time records is permissible, the time must be reconstructed with reasonable reliability. Uncertainties that arise because of poor records should be resolved against the applicant....
>
> * * * * * *
>
> Lack of documentation is not an evil itself, but it creates problems precisely to the extent that it makes the court's task of determining the reasonableness of time claimed very difficult. *New York State Association for Retarded Children v. Carey*, 544 F.Supp. 330, 338–339 (E.D.N.Y.1982). (Citations omitted.)

## MR. ROSENBERG'S APPLICATION FOR FEES

Mr. Rosenberg requested that the Court allow him $130,000.00 for his services as attorney to the debtor and debtor-in-possession from April 1982 until he was replaced on June 10, 1983 by Ballon, Stoll & Itzler. His application is composed of several parts. One part sets forth in numbered paragraphs a narrative of the work performed by the "Petitioner". Attached to this narrative statement is a table which assigns hours and minutes to each paragraph of the narrative. Thus, for example, paragraph 7 is stated to have required 6 hours and 30 minutes. From neither the narrative statement nor the table is it possible to determine which services were performed by Louis Rosenberg and which by one of the other two lawyers with whom he is associated, his brother, Alfred Rosenberg, who is also a seasoned practitioner and Richard Koral, Esq., a young associate who has been a member of the bar for less than five years, and whose services are billed at half the hourly rate charged by the two other attorneys. Nor is it possible to determine from these two documents the exact nature of the services performed. This is the most evident in the claim that 340 hours of work were performed in connection with paragraphs 35–43 of the narrative statement pertaining to the litigation against T.A.T. Airfreight, Inc. ("TAT") without any indication whether the time was spent on depositions, or research, or preparing witnesses, or telephone calls, or on court appearances.

Forming part of the application is an affidavit by Mr. Rosenberg reading in part:

> "No agreement or understanding exists between Petitioner and any other person for the sharing of any compensation to be received or [sic] professional services rendered or to be rendered in connection with this case except Petitioner, agreed

to pay to the firm of ZELBY & BURSTEIN, ESQS. for contributing services, twenty-five (25%) of the awarded allowance."

Two exhibits complete the application: a copy of the complaint in the litigation brought by the debtor against TAT in this court and a copy of the disclosure statement approved by the Court on April 3, 1983, and the plan to which it related subsequently abandoned by the debtor.

Mr. Rosenberg claims the expenditure of a total of 655 hours and 18 minutes on the case. More than half this time is ascribed to the TAT litigation. The application does not set forth Mr. Rosenberg's normal hourly charge but at the hearing he described it as $250.00 an hour and that of Mr. Koral as $125.00 an hour.

### THE OBJECTIONS TO THE APPLICATION

Mr. Rosenberg's application was opposed both by the attorneys of the Creditors' Committee and by Todd M. Breen who is now the only officer and director of Mr. Rosenberg's former client, the debtor and debtor-in-possession, Daylight.

The attorneys for the Creditors' Committee noted that between 360 to 365 hours related to the TAT litigation for which special counsel had been retained; they challenged the accuracy of the schedule of hours forming part of the application questioning the claim that 75 hours had been spent in preparing the application. (Tr. 10/17/83 at 14–15). The representatives of the Creditors' Committee also pointed out that the agreement for division of fees set

forth in Mr. Rosenberg's affidavit violated the prohibition of the Code against such division incorporated in Section 504.[1] *Id.* at 15, 19–20.

Originally, Mr. Rosenberg took the position that there was nothing improper in the agreement described in his affidavit (Tr. 10/27/83 at 16–17, 23), but on October 17, 1983 he submitted a second affidavit in which he said that he had "erroneously stated that [he] 'agreed' to pay to the firm of Zelby & Burnstein a sum equal to 25% of the allowance awarded to [him]" and that a correct statement would have been that he intended to do this. Attached to Mr. Rosenberg's affidavit was an affidavit dated October 18, 1983 from Abraham Burstein, a member of the firm of Zelby & Burstein, in which he said among other things:

"... there was no such agreement, express or implied, between Zelby & Burstein and Louis B. Rosenberg to share or divide the fee to be paid to Louis B. Rosenberg in re the above matter."

Mr. Burstein added that the services rendered by the firm "were not rendered in contemplation of compensation" but in order to serve a client of many years.

Accordingly, in passing of Mr. Rosenberg's application, the Court gave no consideration to Mr. Burstein's services.

Mr. Breen vigorously opposed Mr. Rosenberg's application on many grounds:

(a) He denied that many of the services set forth on the narrative statement had actually been performed. (Tr. 10/17/83 at 63–65).

---

1. 11 U.S.C. Section 504 provides insofar as relevant:

(a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share—
(1) any such compensation or reimbursement with another person; or
(2) any compensation or reimbursement received by another person under such sections.
(b) (1) A member, partner or regular associate in a professional association, corporation or partnership may share compensation ...

with such association, corporation or partnership, and may share in any compensation or reimbursement received ... by another member, partner, or regular associate in such association, corporation or partnership.
The compensation covered by Section 503(b)(2), referred to in Section 504(a), includes "compensation and reimbursement awarded under section 330 of this title." Section 330 is the section under which Mr. Rosenberg's application is made. Section 330 authorizes an allowance to the debtor's attorney of reasonable compensation for the actual, necessary services rendered by such attorney.

(b) He was very critical of the representation he had received, and in particular, that neither he nor anyone else from Daylight had been present at the initial meeting of creditors because of Mr. Rosenberg's failure to advise him of this obligation. (*Id.* at 26–27); and

(c) He claimed that problems had been created for the debtor by his inability to obtain information from Mr. Rosenberg regarding money of the debtor held in an escrow account by Mr. Rosenberg. (*Id.* at 32–33).

After examining the table of hours assigned to the various services described in the narrative in light of the testimony at the hearing and the Court's own records, the Court concluded that the table was unreliable and had to be disregarded in determining the appropriate fee.

Among the many reasons for this conclusion were the following:

(a) The Court agreed with Mr. Ohringer, a seasoned bankruptcy practitioner, that preparation of the application for fees could not have taken 75 hours, the figure shown in the table (Tr. 10/17/83 at 57);

(b) The Court could not credit the claim that the preparation and mailing of the following letter, the subject of paragraph 28 of the narrative statement and quoted below in its entirety, took 2 hours and 24 minutes as claimed in the accompanying table:

"Dear Mr. Lane:

Please be advised that the above-referenced debtor is now up-to-date in the filing of the monthly operating statements."

(c) Since, except for three operating statements, filed as a batch on October 7, 1982, no operating statements were filed until Mr. Rosenberg was replaced and since Mr. Breen denied ever receiving any instruction as to his duties from Mr. Rosenberg, and Mr. Rosenberg acknowledged that it was his practice to give such instruction by means of a form letter (Tr. 10/17/83 at 64, Tr. 10/21/83 at 48), the following services could not reasonably have taken 6½ hours:

"7. The principals of the Debtor were instructed as to their responsibilities as officers of a DIP, their duties to the Court and the Rules of this District. Petitioner reviewed all operating statements and generally advised the debtor regarding matters affecting it."

(d) Based on the Court's own knowledge of the proceedings, the times set forth in the table seemed excessive.

The Court then reviewed the entire record and in light of the facts brought out at the hearing concluded that $15,000.00 represented fair compensation for the services rendered. It set out the reasons for this conclusion *in extenso* on the record (Tr. 10/21/83, 17–71).

The Court reached its conclusions with the profoundest regret. Mr. Rosenberg is a leader of the bankruptcy bar, his eminence in the field is universally recognized. He has honestly won his excellent reputation. As he notes in his application, he has specialized in the field of insolvency law for fifty years, and is currently chairman of the Bankruptcy Committee of the Brooklyn Bar Association, and previously held those positions in the Queens and Nassau Bar Associations.

But even Zeus can nod. In a small and busy law firm, containing only three lawyers, errors can occur, court appearances may be overlooked, and when that happens the value of the services rendered substantially diminishes. Unfortunately, this is what appears to have occurred here.

*The Motion for Reconsideration*

Mr. Rosenberg has moved for reconsideration saying:

"(a) Applicant has been able to reconstruct records of time actually spent in the rendition of services to the debtor; and

(b) In light of the admission by the officer of the debtor that substantial services were performed by my firm, and that even with the debtor's objection, the ad-

ditional sum of $50,000.00 would be acceptable and appropriate, it is clear that the value of services rendered by my firm greatly exceed the amount awarded by the court."

On a *quantum meruit* basis Mr. Rosenberg asserts that the value of his services was "somewhere between the two opposing figures of $50,000 and $115,000.00 in addition to the retention fee."

■ Taking Mr. Rosenberg's second point first, the Court does not find in Mr. Breen's testimony, read in its totality, a concession that a fee of $50,000.00 would be "acceptable and appropriate", although this was the figure Mr. Breen used in estimating how much money Daylight would need on confirmation for Mr. Rosenberg's fee. (Tr. 10/17/83 at 59–60, 62). Any such concession would be inconsistent with Mr. Breen's expressed dissatisfaction with the representation his company had received from Mr. Rosenberg and his opposition to the fee requested. In any event, it is for the Court, not Mr. Breen, to determine what constitutes a reasonable fee. *Matter of Liberal Market, Inc.*, 24 B.R. 653, 657 (B.Ct.S.D.Ohio 1982). "The Court is under a duty to determine independently the reasonableness of fees charged by professionals against a debtor's estate, even if there are no objections by parties in interest." *Ibid.*

Turning to the other ground urged to justify reconsideration, that Mr. Rosenberg has been able to reconstruct records of his time, those records are the self-same records which the Court had before it originally and which it found inadequate. It may be that due to the exigencies of time the Court failed to make it plain on October 21, 1983 that the inadequacy of the record did not disqualify Mr. Rosenberg from all allowance. If it had, he would not have qualified even for the $15,000.00 he was awarded. But because the records were inadequate they could not serve as a guide to what constituted an appropriate fee. Multiplying the hours shown on this "reconstructed" record by some hourly fee, which is the conventional way of arriving

at a "lodestar", would yield a meaningless result since the hourly figure is wholly unreliable. Furthermore, there is no way to know what hourly rate to employ since the table of hours does not differentiate between the services of seasoned lawyers like Mr. Rosenberg, earning $250.00 an hour, and his young associate, Mr. Koral, customarily billed for half that amount.

The Court's conclusion that the $15,000.00 constituted a reasonable fee was not reached lightly or arbitrarily but only after the most scrupulous review of the record to which the Court now turns.

## DAYLIGHT FILES UNDER CHAPTER 11

For many years the late Herbert Burstein, Esq. served as general counsel to Daylight. At his recommendation the then principals of the Corporation, Todd M. Breen and Van P. Marcus, retained Louis Rosenberg in April, 1982 to file for relief in Chapter 11, and he was given a $15,000.00 retainer. On April 30, 1982 the Court authorized his retention.

The immediate consequence of Daylight's recourse to Chapter 11 was that several of its California employees left it to become employees of T.A.T. Airfreight Co. ("TAT"), a competitor. Daylight countered in two ways: first, it moved successfully to have TAT removed from the Committee of Unsecured Creditors to which it had been appointed as one of Daylight's largest creditors; and second, Daylight filed an adversary proceeding in this Court seeking injunctive relief and $2 million in damages. Mr. Burstein took charge of both matters and Daylight was authorized to retain him as special counsel to handle the TAT litigation, but by order of the Court his compensation was limited to $15,000.00, plus out-of-pocket expenses.

After some preliminary procedural maneuvers and several days of trial, the TAT litigation was settled. TAT discontinued its claim against Daylight in the amount of $204,682.00 and Daylight agreed to pay TAT $10,000.00 in ten equal monthly installments. When the principals of Day-

light manifested their unhappiness with the settlement, Mr. Burstein stated that he would waive all fees for his work.

Mr. Burstein did more in this Chapter 11 proceeding, however, than carry the TAT litigation, he also continued to act as advisor to the debtor and to appear with Daylight's principals and speak for Daylight at creditors' meeting. (Tr. 10/21/83 at 37, 38–39). However, Mr. Rosenberg was at all times the only counsel of record in the Chapter 11 proceeding until he was replaced by Ballon, Stoll & Izler.[2]

### THE SECTION 341(a) MEETING

When a proceeding is filed under Title 11, the clerk of the Bankruptcy Court is required to send notice of that fact to all creditors and to advise them of the date fixed by the Court for the meeting of creditors mandated by 11 U.S.C. § 341(a), known as the first meeting of creditors. Bankruptcy Rule 11–24 (now replaced by Bankruptcy Rule 2003). The failure of a debtor to appear at this meeting constitutes grounds for dismissal of its petition. 11 U.S.C. § 343.

On May 16, 1980 the Clerk mailed notices to Louis Rosenberg, to Daylight and to Daylight's 476 creditors that this Section 341(a) meeting was scheduled to be held on June 1, 1982. Subsequently, Louis Rosenberg duplicated the Clerk's notice and mailed it to creditors omitted from the original schedules.

On June 1, 1983 when Daylight's creditors arrived at the Federal courthouse from all over the United States to learn firsthand why Daylight was unable to pay its debts, they encountered almost a total vacuum. No officer or employee of Daylight was present. Mr. Koral, Louis Rosenberg's young associate, apparently showed up but he supplied so little information that until the records of this Court were searched it was thought that no one from Louis Rosenberg's office had appeared. Mr. Breen testified unequivocally that he was absent because he was not advised by Mr. Rosenberg of the hearing. Mr. Ohringer, attorney for the Creditors' Committee, described what followed:

"On that date, June 1, 1982, the [estate] administrator and I both tried to make calls to Mr. Rosenberg's office, having known that he was the attorney for the Debtor. Unfortunately, all of the people in the office were out on other matters and we could not find out whether they had been aware of it, had attempted to adjourn it, or anything else. We don't know whether they got notice, we do know that neither the Debtor nor his attorney came, that we all waited around for an hour and a half and then finally left." Tr. 10/21/83 at 53.

The Court asked how many waited. Mr. Ohringer replied: "There were about ten or twelve creditors. Some of them came as far as Tulsa, and other places. At least twelve creditors were there." (*Ibid.*)

The prejudice done Daylight by the failure of either its principals or Mr. Rosenberg to appear at the scheduled meeting was described by Mr. Breen as follows:

"I believe this was the first step in creating a bad atmosphere to the creditors, and the committee about our sincerity in trying to negotiate a settlement and confirm. I received phone calls the next day from many industry associates asking why we were not present, and it was

---

**2.** The records of Daylight reflect a payment of $15,000.00 to Zelby & Burstein on April 28, 1982 just three days before Daylight filed under Chapter 11, described as paid for "professional fees". This was in addition to two payments made this firm during the previous 60 days described by Daylight's accountant as "Accounts Payable." The reasons for payments to Mr. Burstein are not known to the Court because no statement respecting this compensation paid him has been received. From the Court's own observations of Mr. Burstein's heroic efforts on behalf of his client at great personal cost, any monies paid him were earned twice over. However, if the $15,000.00 paid Mr. Burstein was paid or promised him for services rendered in connection with this Chapter 11 proceeding the firm of Zelby & Burstein should have filed a statement pursuant to Rule 219(b) of the Bankruptcy Rules of Civil Procedure then in effect. No doubt any failure to file such a statement, if due, can be attributed to Mr. Burstein's untimely and most regrettable demise.

assumed that we decided not to operate the business in Chapter 11.... I was never told to appear anywhere." Tr. 10/17/83 at 26.

The day following the scheduled meeting of creditors an informal meeting was apparently arranged at the office of the creditors' attorney as to which Mr. Breen testified as follows:

"The following morning I received a phone call at my home. I was told there would be a meeting of the creditors' committee in half an hour. I explained to Mr. Al Rosenberg, who I got the call from, that I could not possibly be there. I had no idea that I would be required to attend the meeting and couldn't be there in half an hour. That caused myself to be three hours late for the second meeting ... again the relationship with the committee it started off on a bad foot. They sat and waited for the debtor for three hours." Tr. 10/17/83 at 26–27."

Unfortunately, when Mr. Breen arrived, he was unwilling to give the Committee the information it wanted because of the presence on the Committee of TAT, an excuse to which the Creditors' Committee was not sympathetic.

Mr. Breen testified that he continued to receive inadequate notice of the hearings he was required to attend and the documents he was obliged to produce:

"Throughout the proceedings we received no notice of meetings, notice of documents that had to be prepared for the Court or the Committee by the company or our accountants always at the last minute.... Things were always needed in a manner that forced us to do it under pressure. I complained about it several times. It seems to me that there should have been more notice to the debtor to give us a chance to prepare for the meetings or any documentation the committee or the Court wanted. When it came time to schedule meetings, I always had a problem with Mr. Rosenberg making himself available to myself and the committee. I had a process of calling from professional to professional to try

and adjust everyone fitting into Mr. Rosenberg's schedule. I found that to be a little ridiculous." (Tr. 10/17/83 at 27–28).

Mr. Breen was of the opinion that he encountered unnecessary difficulties with his creditors because Mr. Rosenberg was unable to develop a good working rapport with the attorneys for the creditors:

"I don't believe that our position of sincerity to cooperate and negotiate in good faith and confirm this plan was ever conveyed. We never got that message across. An atmosphere, we always had an atmosphere of hostility and meetings which were tense. Mr. Rosenberg's approach to joke about it or kibbitz, to use that word. I believe that the creditors' committee resented that.

The people from the airlines, these people were employed by large corporations. They were there to do a job. They were not there to joke around. I believe it translated into an attitude towards Daylight towards one where we were not going to make it, that we were not serious." Tr. 10/17/83 at 34.

### THE ESCROW ACCOUNT

On July 1, 1982 Daylight's creditors gave concrete evidence that they distrusted Daylight and that they did so, in part, because of Daylight's failure to appear at the Section 341(a) meeting. On that date they applied by order to show cause to have the debtor's liquid assets placed in escrow saying that they were "disturbed by the lackadaisical attitude of the Debtor" demonstrated by, among other things, Daylight's absence from the June 1, 1982 meeting. Daylight acquiesced in the creditors' demand and $650,000.00 was turned over to Louis Rosenberg to put into an escrow account in the name of the debtor.

According to Mr. Rosenberg's application, drafting of the order setting up this escrow account consumed nine hours and 36 minutes and monitoring and reinvesting the funds required another ten and one-half hours. Despite the time given the escrow account Mr. Breen complained that he and

his comptroller would "always have somewhat of a battle in trying to get" information from Mr. Rosenberg respecting how much money there was in the account as a result of accrued interest. (Tr. 10/17/83 at 33). This figure was important to Daylight because it constituted the money which Daylight would be using to fund whatever plan it ultimately proposed.

That there was difficulty in obtaining information respecting the balance in the escrow account was confirmed when the Court entered an order directing Mr. Rosenberg to turn over the escrow account to Ballon, Stoll & Itzler, the law firm which replaced Mr. Rosenberg as Daylight's counsel. Mr. Breen testified as to what then occurred:

"The time the counsel was substituted, the escrow account was turned over to Mr. Strumpf and his firm. I got a copy of the transmittal to Mr. Strumpf. I reviewed the numbers. I felt that depending on how the treasury bills were turned over, there should have been more money.

There was not enough money. There I required [sic] with Mr. Lipshie, our accountant. He did some work and determed that, yes, it seemed correct, there should have been more money. I communicated with Mr. Strumpf. Mr. Strumpf apparently communicated with Mr. Rosenberg and an additional check in the amount of approximately $21,500.00 was then forwarded as having been left in the account. I was not happy with that to say the least." (Tr. 10/17/83 at 33.)

The day following the receipt of this testimony the Court received a letter from Mr. Rosenberg taking sharp issue with the implication that he had engaged in any impropriety, but otherwise confirming the essentials to which Mr. Breen had testified. Mr. Rosenberg's letter confirmed that on July 11, 1983 Mr. Rosenberg sent Ballon a check for $622,671.76 at a time when the balance on hand in the escrow account was $642,671.76, or $20,000.00 more. Thereafter, after having been advised by Daylight's accountant that the check was too small, he forwarded a second check for $21,775.66 on August 2, 1983. This figure consisted of the previously unforwarded balance of $20,000.00 plus interest for the month of July of $1,775.66. Mr. Rosenberg says that he failed to forward all the money to Ballon because the Bank on July 11, 1983 understated, in response to a telephone inquiry, the balance in the account by $20,-000.00.[3]

3. "I was informed that after I excused myself from the hearing on the application for professional allowances, Todd Breen, an officer of the debtor, implied in a statement before the Court that while escrowee of the debtor's funds I failed to turn over the entire fund to the replacement law firm of Ballon, Stoll & Itzler, Esqs.

This allegation, accusation or innuendo is outrageous and insulting to me, and I will not be abused by Mr. Breen without response.

Upon the demand of the debtor, and its replacement counsel, that I immediately turn over the fund held in the Chase Manhattan Bank, in an account in the name of the debtor. [sic] As soon as the interest-bearing instrument matured, I telephoned the bank for exact balance on hand. I was told that it was $622,671.76. I immediately drew a check in that sum to the order of Ballon, Stoll & Itzler on July 11, 1983.

I was subsequently informed by the accountant for the debtor that the balance should have been greater than that sum. The bank statement for the period which would include the

last interest earned had not yet been received by me.

Nevertheless, I called the bank again for the balance and was told that $21,775.66 remained in the account. I, thereupon drew a check in that amount on August 2, 1983 to the firm of Ballon, Stoll and Itzler, Esq.

I thereafter received the bank statement for the month ending August 3, 1983, which made clear the fact that when I had originally called, the sum of $642,671.76 had been on deposit, and $1,775.76 was subsequently credited to the account for interest. This is the kind of confusion that I typically seek to avoid when acting in a fiduciary capacity, by resisting impatient demands for immediate turn-over prior to the receipt of all appropriate bank records. Annexed hereto are copies of the bank statements dated 8/3/83 and 9/6/83.

I have consistently endeavored to keep the records of this fund as clear and traceable as possible. The account was not placed in my name, but rather in the *debtor's* name, in care of me. In this manner there can be no confusion as to who the fund belonged to, and any infer-

## THE CREDITORS' APPLICATION TO LIQUIDATE DAYLIGHT

During the course of the Chapter 11 proceeding, Daylight's business deteriorated. Originally it was believed that it would be able to pay creditors 100% over a period of time and such a plan had in fact been drafted by the Creditors' Committee; later what was proposed was a 50% plan with the proceeds from the TAT litigation to make up 5% of that total. That plan had progressed to the point of approval by the Court, after hearing of a disclosure statement. But with the collapse of the TAT litigation and the downward spiral of Daylight's business leading to the loss of the financing on which it had counted, that plan became impossible of execution. At that point, Daylight's principals saw no alternative but to negotiate a different plan with its creditors and asked Mr. Rosenberg to do so. To quote from Mr. Rosenberg's affidavit:

> "An unfavorable reaction could be anticipated but at the insistence of the principals of the Debtor, Petitioner made arrangements to meet with the committee and its counsel on May 18th at which time petitioner attended with the Debtor's accountant and, after lengthy discussion, proposed a modification of the Plan of Arrangement in accordance with the wishes of the principals. The committee of creditors vehemently rejected the modified proposal and manifested displeasure by initiating an application by order to show cause for an order appointing a trustee pursuant to 11 U.S.C. 1104(a)."

At the same time three of Daylight's principal creditors wrote the Court that they would not accept any plan proposed by Daylight.

What Daylight's creditors wanted was the appointment of a trustee to liquidate Daylight which would have put an end to its business existence.

Mr. Burstein had planned to represent the debtor in opposing the creditors' application but he was too ill to do so, so that the burden fell on Mr. Louis Rosenberg. When the hearing on the appointment of a trustee recessed because of the lateness of the hour, at 6:30 P.M., the Court was virtually persuaded that the creditors were entitled to the relief they sought.

The following day, Mr. Breen retained Ballon, Stoll & Itzler to replace Mr. Rosenberg and the hearing was never resumed. Daylight's new counsel were able to induce the creditors to give up their efforts to liquidate Daylight and to agree to a plan which appears to be feasible.

## THE VALUE OF MR. ROSENBERG'S SERVICES

For clarity it will be helpful to consider Mr. Rosenberg's application in two parts: the TAT litigation and the balance of the Chapter 11 proceeding.

Over half of the 655 hours which Mr. Rosenberg claims were required by this proceeding relate to the TAT litigation which he says took close to 360 hours.

When the Court appointed Mr. Burstein as special counsel to handle this litigation the Court assumed that he would be in charge. Mr. Burstein appeared at every critical hearing and when the trial began he conducted it. Mr. Breen confirms that Mr. Burstein carried the burden of this litigation.

> "With respect to the TAT trial, the pretrial depositions, all the research and work for the trial was certainly done by Mr. Burstein. I say that because I spent all of the time with him, both in California, and meetings and Mr. Rosenberg was not present at these meetings. Mr. Rosenberg did not develop these, the strategies for the questions. He was not present with us, Mr. Burstein and myself, nor did he contribute to any of that." (Tr. 10/17/83 at 31).

Respecting the TAT depositions, Mr. Breen said: "... during some of the

ence that funds were being concealed is as absurd as it is venomous."

Enclosed with the letter were copies of the bank statements and checks referred to in the letter.

pretrial depositions for the TAT lawsuit that took place in this building, very often Mr. Rosenberg would say that he had another case going on in the building or had something that he needed to be signed. He would be back. He would excuse himself. I felt that by doing so he very often lost the flow of the questioning and deprived us, meaning my company, of his legal services." (Tr. 10/17/83 at 30).

Acting in the capacity of an assistant to Mr. Burstein, Mr. Rosenberg could not have reasonably expected any more than a fraction of the maximum fee which the Court authorized for payment to Mr. Burstein. When the Court placed a ceiling of $15,000.00 on the fee to be paid Mr. Burstein for the litigation, it was trying to put a cap on its cost to the debtor. There are other considerations present here. Although the settlement was the best that could be reached, it represented a defeat in terms of the expectations of the debtor, not a victory. No doubt this was why Mr. Burstein, after all the effort he had put into the matter, agreed to waive his fee.

█ Bearing in mind the disappointing conclusion of the litigation and Mr. Rosenberg's minor role, if it is assumed that $5,000.00 of the $15,000.00 paid Mr. Rosenberg as an initial retainer is for the work he did on the TAT litigation, it appears to the Court that he has been adequately compensated for this aspect of his application.

As to the representation afforded the debtor, apart from the TAT litigation, Mr. Rosenberg claims to have spent about 295 hours. This figure must be reduced by the 75 hours attributed to preparation of the application for compensation, which is not compensable out of the estate, leaving about 220 hours. For the reasons stated earlier, this Court deems this figure unreliable.

The Court's records show eight hearings in this proceeding, two of which Mr. Koral appeared for the debtor and all, except for the hearing on the appointment of a trustee, routine. In addition to the hearings, the Court's docket reflects that around twelve to fourteen documents were prepared for the debtor by Mr. Rosenberg's firm, many of which were boilerplate. None of these should have been very time consuming.

But hours are not the only criteria of the value of a lawyer's services. The object of a Chapter 11 proceeding is the salvage of a business: otherwise its owners would simply declare bankruptcy. A lawyer is retained to accomplish this salvation. It is not always possible: that a Chapter 11 proceeding ends in the liquidation of the debtor does not forfeit a lawyer's right to compensation. But success, and conversely failure, is never irrelevant to the value of a lawyer's services.

In this case up to the point where Mr. Rosenberg was replaced, the Chapter 11 proceeding was failing of its objective: the creditors were unwilling to negotiate a plan which the debtor, in its steadily deteriorating situation, could finance and were insisting on the debtor's liquidation. With a change in counsel, the situation was turned around, a plan was negotiated and confirmed and liquidation has been avoided. These facts are pertinent in placing a value on Mr. Rosenberg's services. Furthermore, while the Court does not necessarily believe all of Mr. Breen's animadversions, since he has a financial interest in minimizing the fee to be paid Mr. Rosenberg, and while no doubt the alienation of Daylight's creditors was due principally to its deteriorating financial position and the ever smaller promised payout, nevertheless, two of Mr. Breen's serious allegations are established as facts.

The Court's own records establish that at the first meeting of creditors no one from Daylight appeared nor was anyone present from the office of Mr. Rosenberg to explain Daylight's failure to meet its most elementary obligation to its creditors under the Bankruptcy Code. The creditors' efforts to get any information from Mr. Rosenberg's office respecting the reasons for the absence of Daylight's officers apparently encountered a blank, and the creditors, after a meaningless hour and a half

during which their ire undoubtedly rose, were forced to disperse.

During the course of the hearing on allowances, Mr. Louis Rosenberg pointed out that it is the obligation of the debtor to be present at the first meeting of creditors. But the very reason that laymen retain lawyers when they become involved in legal proceedings is to advise them as to their responsibilities and to assist them in carrying them out.[4]

If Mr. Breen believes that this bad beginning seriously prejudiced the debtor's future relations with its creditors, he has reason for his belief. When creditors come to the first meeting of creditors and find no one there to explain what occurred or what they can expect, they conclude that the debtor is indifferent to their claims and they fear the worst. The effect on their good will is predictable. Had the creditors not been alienated by the "lackadaisical attitude" they ascribed to the debtor because of the debtor's failure to appear at the first meeting, it is possible they might never have sought to escrow the debtor's assets nor subsequently applied for the appointment of a trustee when the debtor encountered difficulties in devising a plan that was both feasible and acceptable. In that event, many of the hours for which Mr. Rosenberg now seeks compensation, as, for example, the monitoring of the escrow account, might never have been necessary.

Mr. Breen's problems in obtaining accurate figures respecting the escrow account is also borne out by what occurred when the Court ordered the account turned over to new counsel. A $20,000.00 discrepancy to a corporation fighting for its survival is not a small matter.

Finally, a fact which the Court deems of importance, is that Mr. Rosenberg failed to bring home to the debtor the importance of complying with Local Rule 19 of the Bankruptcy Rules of the United States Bankruptcy Court of the Eastern District of New York which requires monthly reports in Chapter 11 proceedings of receipts and disbursements. Had the debtor filed such statements, its deteriorating position would not have come as such an unwelcome surprise to the creditors and a plan that could not be funded would never have been drawn up and processed.

What has occurred here has been costly to the debtor. The attorneys for the creditors' committee have sought and been given compensation for their attendance at the first meeting of creditors at which no one was present, for their work in escrowing the debtor's funds, for preparing or working on the various plans that were not feasible and for seeking the appointment of a liquidating trustee.

Ballon, Stoll & Itzler, the debtor's new counsel, have asked and received compensation for doing the same work as Mr. Rosenberg was originally retained to do. The debtor has been required to pay twice for the same services.

Not all cases are equally successful. Sometimes the chemistry between a lawyer and his client is bad making communications between them difficult. Mr. Breen and Mr. Rosenberg were not a happy match. No one is saying that Mr. Rosenberg should forfeit all compensation because of what went wrong in this proceeding, but it is unreasonable to demand compensation appropriate to an Edward Bennett Williams or a John Davis in circumstances like those present here.

Fifteen thousand dollars is a relatively large sum of money to this debtor which is struggling to survive and which is borrowing the money to pay its lawyers. Probably it does not compensate Louis Rosenberg at his regular hourly rate for the hours spent by himself and his associates in representing Daylight, although in the

---

**4.** There is no question but that notice of the first meeting of creditors was sent by the Clerk of the Bankruptcy Court to Daylight's office and there is likewise no question but that Mr. Breen stated categorically that he had no knowledge of that meeting. It is not unreasonable to surmise that when Daylight's personnel received the notice that it was filed away under the assumption that Daylight's attorneys were taking care of the matter.

absence of reliable time records it is impossible to be sure that it does not. But if it is on the low side and if it leaves some hours uncompensated, it is still the Court's opinion that it satisfies the requirements of *quantum meruit.*

For the foregoing reasons, the motion for reconsideration is granted but on reconsideration the Court adheres to its earlier decision.