**In the Matter of CENA'S FINE FURNITURE, INC., Debtor,**

**Appeal of PLATZER, FINEBERG & SWERGOLD.**

**No. 89–CV–2850.**

United States District Court, E.D. New York.

Jan. 3, 1990.

Platzer, Fineberg & Swergold, New York City (Sydney Platzer, Steven D. Karlin & Clifford A. Katz, of counsel), pro se.

## MEMORANDUM–DECISION & ORDER

BARTELS, District Judge.

The law firm Platzer, Fineberg & Swergold ("PF & S"), *pro se*, appeals from a May 8, 1989, decision of Bankruptcy Judge Marvin A. Holland, and an order dated June 12, 1989, by Bankruptcy Judge Jerome Feller acting for Judge Holland under Local Bankr.R. 3, E.D.N.Y., awarding in part and denying in part attorney fee applications of PF & S under 11 U.S.C. § 330(a). Because this Court finds that the Bankruptcy Court failed to apply the correct legal standards in deciding the attorney fee applications, and since the factual findings of the Bankruptcy Court are clearly erroneous, the decision and order appealed from are reversed.

### I. FACTS

#### A. *The Bankruptcy Case/The Fee Applications*

The underlying bankruptcy case of *In re Cena's Fine Furniture, Inc.*, 186–60439–352 (Bankr.Ct.E.D.N.Y.), was brought about by the gambling of Mr. Larry Cena, owner of Cena's Fine Furniture, Inc. (the "Debtor"), who milked the Debtor dry to pay his gambling debts. On March 5, 1989, after Cena had dissipated almost all of the Company's assets, creditors of the Debtor (the "Petitioning Creditors") filed a petition for involuntary proceedings against the Debtor under Chapter 7 of the Bankruptcy Code. Subsequently, on March 28, 1986, the Debtor itself filed a petition converting the involuntary proceedings to a voluntary proceeding for reorganization under Chapter 11 of the Bankruptcy Code, and the Bankruptcy Court formed a committee of the Debtor's 20 largest unsecured creditors (the "Creditors' Committee"). PF & S represented the Petitioning Creditors from February 27, 1986, to March 31, 1986, and thereafter was retained to represent the Creditors' Committee from March 30, 1986, to March 31, 1989. Other than $750.00 paid to it by the Petitioning Creditors, PF & S received no compensation for its three years of work on the underlying case.

In papers filed April 4, 1989, PF & S, as counsel to the Petitioning Creditors and as counsel to the Creditors' Committee, sought compensation from the Debtor's estate for attorney fees and expenses pursuant to 11 U.S.C. § 330(a). PF & S's two applications in both of its capacities set out the expertise and the qualifications of the firm which, in short, showed that PF & S (and its predecessor firm, Platzer & Fineberg) had specialized in bankruptcy proceedings for more than thirty years. To both its applications PF & S appended schedules upon which it had transcribed time slips that employees of the firm filled out whenever they performed work on behalf of the Petitioning Creditors and the Creditors' Committee. PF & S made clear to the Bankruptcy Court that the original contemporaneous slips were on file and would be made available to the Bankruptcy Court upon request. The schedules show that PF & S bills all its work out in multiples of 6 minutes (i.e., expressed in units of .1's of an hour), and contain a concise description of the work performed.

The total number of hours for which PF & S, as counsel to the Petitioning Creditors, sought to be paid was 91. PF & S averred that the value of the services ren-

dered was $13,463.00, but it did not explain at how it arrived at this figure. It further sought reimbursement for costs said to total $855.00. Again, however, PF & S did not explain exactly what costs were reflected in the $855.00 other than stating, "Applicant has actually expended funds in the form of messengers, overnight delivery, telecopy services, long distance telephones calls and photocopying, without receipt of reimbursement for same. No expenses have been charged for word processing or secretarial overtime. Finally, none of the reimbursements sought by Applicant for expenses necessarily expended include those expenses which constitute ordinary business overhead of Applicant." [1]

In its application PF & S also explained in narrative form just what it had done for the Petitioning Creditors. In sum, this consisted of the very important task of turning the Debtor's "zero-asset" estate into an estate with assets from which taxes could be paid and creditors' claims at least partially satisfied. PF & S was able to do this by discovering that Cena was involved in a scheme with a relative, also in the furniture business, whereby the relative purchased the Debtor's assets after foreclosing on them through a fraudulent security interest that had apparently been issued for a non-existent debt.

After this discovery, PF & S then prepared and filed the above-discussed involuntary petition in bankruptcy against the Debtor, brought on proceedings by order to show cause why the fraudulent transfer of assets should not be set aside, ordered and examined the results of a UCC filings search, and commenced examinations under Bankr.R. 2004 to protect the Debtor's estate by unearthing Cena's fraud.[2] As a result of PF & S's efforts, the Debtor's assets held by the company owned by Cena's relative were reconveyed to the Debtor, and the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

PF & S's fee application as counsel to the Creditors' Committee sought compensation for 239 hours, including 2 hours for the time spent on the fee application itself and an additional 15 hours which PF & S anticipated expending on the matter after the fee application was submitted "although it appear[ed] that more time [would] be required." In this second application PF & S asked for $45,053.50 in attorney fees and $856.00 in expenses. PF & S explained that the $45,053.50 figure was arrived at by multiplying the 239 hours by $188.50, which represented the "mixed" hourly rate PF & S charged for partners, associates, and paralegals, over the three year period it represented the Creditors' Committee. Although PF & S further explained that the billing rate during that period was

Partners: $180 to $275 an hour;
Associates: $100 to $175 an hour; and
Paralegals $ 50 to $ 60 an hour;

it did not reveal *when* within the three year period any of these rates were in effect or *how* it arrived at the "mixed" rate of $188.50. Furthermore, although PF & S's application stated that Ira L. Herman and Steven D. Karlin had both been accepted to partnership in the firm at some time during the three relevant years, it did not indicate *when* the services of these attorneys began to be billed at partner rates.

This second application went on to detail, again in narrative form, the various services PF & S performed for the Creditors' Committee, including 1) formal and informal meetings with Cena regarding Cena's gambling problem and how, as a result, the

---

**1.** Although PF & S's application stated, "Applicant has annexed a recapitulation and itemization of expenses sought," no such recapitulation was so annexed to the application.

**2.** Bankr.R. 2004 provides in pertinent part that, on motion of any party in interest, the court may order the examination of any "entity" relating to the "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the adminis-

tration of the debtor's estate, or to the debtor's right to a discharge." Bankr.R. 2004(a), (b). "The scope of a Rule 2004 examination is unfettered and broad and the rule itself is peculiar to bankruptcy law and procedure.... Examinations under Rule 2004 are allowed for the purpose of discovering assets and unearthing frauds." *In re Table Talk, Inc.,* 51 B.R. 143, 145 (Bankr.D.Mass.1985) (citations and internal quotations omitted).

Debtor had been plunged into financial straits; 2) twice going to the capital of the United States furniture industry, High Point, North Carolina, to assure creditors that the Debtor was a viable concern and to purchase merchandise; 3) satisfying consumer claims and answering their questions; 4) negotiating with counsel for the Debtor regarding a consensual plan of bankruptcy; 5) aiding the Debtor in selling a leasehold owned by it; 6) participating with the Debtor's counsel in litigation which sought to determine and resolve the Debtor's tax obligations; 7) taking part in the decision to abandon the reorganization plan and appoint a Chapter 11 Trustee who would liquidate the Debtor's business; 8) preparing the disclosure statement for the plan of reorganization filed by the Chapter 11 Trustee; 9) undertaking litigation against Cena during which Cena agreed to the entry of a $250,000.00 judgment against him on behalf of the Debtor's estate; and 10) assorted other tasks.[3] In sum, PF & S played a substantial role in the Chapter 11 proceedings. Finally, the second application of PF & S sought compensation for the following costs:

| | |
|---|---|
| Document Reproduction | $277.00 |
| Postage | $ 52.00 |
| Long Distance Calls | $ |
| Messenger | $ |
| Local Transportation | $ 7.00 |
| Travel to High Point, N.C. (2 times) | $520.00 |
| Federal Express | $ |
| Total: | $856.00 |

B. *The Proceedings and Decision Below*

At a hearing held April 12, 1989,[4] the Bankruptcy Court expressed its dissatisfaction with PF & S's fee applications:

> I can go through the whole application because I spent a considerable amount of time doing it. The amounts of time that are set forth opposite this is simply not realistic.
>
> I will be happy to give you an opportunity to amplify them if you like, but the amount of time that you are seeking for some of the services that you describe, the services described simply don't justify the amount of time that appears in the right hand margin.[5]

---

**3.** Listed by PF & S in its application, somewhat cumulatively, as:

    1. Attended 341(a) meetings and conducted examinations of the Debtor.
    2. Played an active role in resolving the problems of credit and the obtaining of merchandise by the Debtor.
    3. Performed some services which would ordinarily have been performed by Debtor's counsel, namely, preparation of the bar order, and preparation of disclosure statement.
    4. Approved all of the orders submitted by the Debtor with respect to the conducting of its Chapter 11 proceeding.
    5. Dealt with consumers on a one to one basis via telephone calls in an attempt to resolve their problems.
    6. Dealt with consumer affairs agencies calling for status of information and attempting to correct consumer problems.
    7. Actively negotiated and participated in resolution of tax problems of the Debtor.
    9. [sic] Consulted with various members of the Creditors' Committee and other creditors with respect to the conduct of the within proceeding.
    10. Drafted agreements and stipulations required to effect the Plan of Reorganization herein.
    11. Prepared several applications and orders for submission herein.
    12. Reviewed Debtor's corporate structure, financial and operating reports.

    13. Consulted with the operating trustee with a view to the effective liquidation of the Debtor by the sale of merchandise under the auspices of an operating trustee and liquidator, rather than by auction.

**4.** The original fee application hearing was scheduled for April 5, 1989. As the Bankruptcy Court had received PF & S's applications just prior to the hearing, Sydney Platzer, appearing for PF & S, suggested that the court deem the matter submitted to allow the court to review the applications at its leisure. The court replied: "If you want them submitted such that you don't get feedbacks as to any deficiencies I find and you simply *want me to chop*, I will be happy to do it." (Transcript of hearing held before Bankruptcy Judge Marvin A. Holland on April 5, 1989 ["Tr.–I"] at 2) (emphasis added). Not surprisingly, Mr. Platzer asked for a one week adjournment rather than accept the Bankruptcy Court's offer to "chop." *Id.*

**5.** Transcript of hearing held before Bankruptcy Judge Marvin A. Holland on April 12, 1989 ["Tr.–II"] at 18. Although the Bankruptcy Court's comments here went specifically to PF & S's application as counsel to the Creditors' Committee, it is clear that they applied equally to the application as Petitioning Creditors' counsel. *See* Tr.–II at 21.

It was therefore decided that PF & S would submit a supplemental application to amplify the original applications, and the Bankruptcy Court several times referred counsel to its own "fee application checklist." [6]

PF & S's supplemental application was filed on April 26, 1989. In it PF & S reiterated, in narrative form, the facts of the case, tasks it had performed, and the results it had obtained. PF & S again averred that the compensation sought was reasonable in terms of actual hours expended. Also appended to the supplemental application were copies of the time schedules that had already been attached to and submitted with the two previous applications. This time, however, PF & S added an explanatory note next to sixteen of the entries which amplified the work performed and/or the reasons behind it. Most of the sixteen were entries that the Bankruptcy Court had questioned at the hearing.

On May 8, 1989, the Bankruptcy Court issued its Memorandum regarding the fee applications. In part the Memorandum stated:

> Serious deficiencies and omissions with regard to the applications were communicated by the court to the applicants at the first [sic] hearing held on the applications. Each of the applicants requested additional time for further submissions which was granted. In addition, each of the applicants was advised at the hearing of the availability in Chambers of copies of the court's *check list* with regard to fee applications. While it is not known whether or the extent to which various applicants availed themselves of this *check list*, none of them makes any attempt to comply even with the minimum standards as set forth therein.[7]

The Bankruptcy Court then went on to examine PF & S's application as the Petitioning Creditors' counsel and its application as counsel to the Creditors' Committee. The Bankruptcy Court declared that the explanatory notes of PF & S in its supplementary application were either unintelligible or useless,[8] and cited numerous examples (which allegedly were "not inclusive"[9]) of what it found to be "grossly excessive" time claimed for various services rendered.[10] The Bankruptcy Judge then altogether abandoned the time schedules of PF & S and awarded what it considered reasonable sums based on the applications' narrative description of services. PF & S was granted $5,000 as the Petitioning Creditors' counsel and $20,000 as counsel for the Creditors' Committee, resulting in a reduction in the fees requested of 37.14% and 44.39% respectively. Because PF & S had made no attempt to itemize the expenses sought as Petitioning Creditors' counsel, the Bankruptcy Court disallowed any reimbursement, and even though PF & S had attached to its application as counsel to the Creditors' Committee the summary of disbursements set forth *supra*, the Bankruptcy Court wrote that "since the summary of disbursements is insufficient to meet the requirements of a detailed statement and explanation setting forth not only the nature of the disbursements but sufficient information for the court to determine their necessity and appropriateness, no disbursements will be allowed." [11]

## II.  DISCUSSION

### A.  *Standard of Review For Award of Attorney Fees*

Section 330 of Title 11, United States Code ("§ 330"), provides that the bankruptcy court may award

(1) reasonable compensation for actual, necessary services rendered by ... [an] attorney, ... and by any paraprofessional persons employed by such ... attorney, ... based on the nature, the extent, and the value of such services, the time

---

**6.**  Tr.–II at 5, 8, 10.

**7.**  Memorandum of Bankruptcy Judge Marvin A. Holland, dated May 8, 1989 ("Mem."), at 2 (emphasis added).

**8.**  Mem. at 3.

**9.**  *Id.* at 7.

**10.**  *Id.*

**11.**  *Id.* at 8.

spent on such services and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (1988). Thus, the bankruptcy court is given the power to award compensation for attorney fees.

As to the review of any bankruptcy court decision, Bankr.R. 8013 provides:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

■ Accordingly, in view of the deference to be paid to the bankruptcy court's findings of fact under Rule 8013, and because the bankruptcy court has the power to decide whether to allow compensation of attorney fees and expenses out of the debtor's estate under § 330, "[t]he standard of review on appeal of a fee award from a bankruptcy court is that the decision of the bankruptcy judge will be affirmed unless the bankruptcy judge has abused his discretion—i.e., failed to apply proper procedures or legal standards, or made factual findings that were clearly erroneous." *In re Ferkauf, Inc.*, 56 B.R. 774, 775 (S.D.N.Y.1985). *See also In re Shades of Beauty, Inc.*, 95 B.R. 17, 18 (E.D.N.Y.1988).

### B. Attorney Fees in Federal Courts
#### 1. The Pre–"Lodestar" or Johnson Approach

Using factors culled from the American Bar Association Code of Professional Responsibility DR 2-106, the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), developed a 12–factor analysis to arrive at a "reasonable" attorney fee in federal cases.[12] The 12 factors included "[t]he novelty and difficulty of the [legal] questions [presented]," *id.* at 718, "[t]he experience, reputation, and ability of the attorneys," *id.*, and "[t]he amount involved and the results obtained," *id.* The *Johnson* analysis was widely adopted in many cases in courts throughout the circuits, *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air,* 478 U.S. 546, 562, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986), and was also used in bankruptcy cases, *see In re First Colonial Corp. of America,* 544 F.2d 1291, 1299 (5th Cir.), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). *See also In re Nine Associates, Inc.,* 76 B.R. 943 (S.D.N.Y.1987); *In re Cuisine Magazine, Inc.,* 61 B.R. 210 (Bankr.S.D.N.Y.1986); *In re Daylight Transport, Inc.,* 42 B.R. 20 (Bankr.E.D.N.Y.1984); *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249 (5th Cir.1986): *Harman v. Levin (In re Robertson),* 772 F.2d 1150 (4th Cir.1985); *In re Pacific Express, Inc.,* 56 B.R. 859 (Bankr.E.D.Cal. 1985).

PF & S claims that the Bankruptcy Court erred as a matter of law in failing to consider all of the *Johnson* factors, particularly the "results obtained" element. A review of the current law on the subject of attorney fees, however, has made it appar-

---

12. *Johnson* was a non-bankruptcy case which involved an attorney fee authorized by a so-called "fee shifting" statute. While the general "American" rule has long been that each party to a litigation, victorious or defeated, must bear the cost of its own attorney fees, *Alyeska Pipeline Co. v. Wilderness Soc.,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1974), statutory exceptions to this rule have been created in "fee shifting" statutes, most notably in 42 U.S.C. § 1988 which provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the

costs." 42 U.S.C. § 1988 (1982). *See also* 42 U.S.C. § 7604(d) (1982) (providing for "reasonable" attorney fees under the Clean Air Act); 29 U.S.C. § 1132(g)(1) (1982) (authorizing "reasonable" attorney fees in ERISA cases).

Although the policies behind, and circumstances in applying these fee shifting statutes are not exactly the same as those found in the bankruptcy arena, *see Manoa,* 853 F.2d at 691, in determining a "reasonable" fee under § 330 the bankruptcy courts nevertheless employ the standards devised for determining a "reasonable" fee under the fee shifting statutes. *Id.* at 690–91.

ent to this Court that the *Johnson* analysis is no longer *per se* applicable to fee awards in federal courts.

### 2. The "Lodestar" Method & The Failure To Apply It In This Case

It is now settled that the "lodestar" method of fee calculation developed by the Third Circuit, *see Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973), is *the* method to be used to determine a "reasonable" attorney fee in all the federal courts, including the bankruptcy courts. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware Valley II*"); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("*Delaware Valley I*"); *Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *United States Football League v. National Football League*, 887 F.2d 408, 413 (2d Cir.1989); *In re Manoa Finance Co.*, 853 F.2d 687 (9th Cir.1988). "Generally, the first step in the calculation of reasonable attorney's fees is the determination of the so-called 'lodestar' amount. The lodestar amount represents the number of hours reasonably worked on a case multiplied by the reasonable hourly rate." *Wells v. Bowen*, 855 F.2d 37, 43 (2d Cir. 1988) (citations omitted).

■ The Supreme Court has made it clear that the lodestar amount is presumed to subsume the 12 factors articulated by *Johnson*. Feeling that the *Johnson* 12-factor approach was "unguided," *Delaware Valley I*, 478 U.S. at 563, 106 S.Ct. at 3097, and "subjective," *id.*, and gave judges "unlimited discretion," *id.*, which produced "disparate results," *id.*, the Supreme Court has stated that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee." *Id.* at 566, 106 S.Ct. at 3098. Indeed, the Court specifically held in *Blum*

that the "novelty and complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the *"results obtained"* from the litigation are presumably fully reflected in the lodestar amount. 465 U.S. at 898–900, 104 S.Ct. at 1548–49 (emphasis added). Thus, PF & S is incorrect to the extent that it assigns error to the Bankruptcy Court in not increasing the award due to the "results obtained" by PF & S in the underlying bankruptcy case. For, "[a]lthough upward adjustments of the lodestar figure are still permissible, . . . such modifications are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098 (quoting *Blum*, 465 U.S. at 899, 104 S.Ct. at 1549). Here, while PF & S's work was certainly laudable, the record reveals nothing "exceptional" or "rare" enough about this case to justify an adjustment upward from the lodestar amount. Accordingly, the Bankruptcy Court did not abuse its discretion in refusing to enhance the award of fees because of the results obtained.

■ More troubling, however, is the Bankruptcy Court's utter failure to engage in the analysis required by the lodestar approach. As recited above, after pointing to various entries on both applications which the Bankruptcy Court found lacking in specificity of description, or which it found grossly overstated the amount of time spent on the task described, the Bankruptcy Court completely abandoned the time records supplied by PF & S and "fix[ed] an award for the *minimum* time necessary to provide the *minimum* required services, estimated on the basis of the court's own experience in these matters."[13] No effort was made, as a first step, to determine a reasonable or prevailing hourly rate and, as a second step, to multiply that rate by the number of hours found to reasonably have been spent on the case. This constituted an abuse of discre-

---

**13.** Mem. at 5. *See* Mem. at 8–9.

tion which resulted from one mistake of fact and at least two mistakes of law.

The mistake of fact occurred in the Bankruptcy Court's finding that the time records were essentially incredible *in toto*. While the Court agrees with the Bankruptcy Court that some inevitable "puffing" took place in the records, despite the deference owed to the Bankruptcy Court this Court cannot follow its hostile approach exemplified by the following passage from its Memorandum:

> With regard to a task as simple, *pro forma* and perfunctory, as preparing a boilerplate application for retention of counsel to a creditors' committee, the following time items appear in the application:

| | | |
|---|---|---|
| 04 08 86 | DK T/C to Judge Holland's chambers re formation of a committee | .6 hrs. |
| 04 09 86 | DK T/C to Judge Holland's chambers re formation of a Committee (2X) | .8 hrs. |
| 04/10/86 | DK In court to pick up order appointing creditors' committee | 1 hr. |
| 04/10/86 | DK T/C to Joel Schafferman (law clerk) re order forming creditors' committee & requirements. | .2 hrs. |
| 04/11/86 | DK Drafted order to retain P & F as counsel application and affidavit | .8 hrs. |
| 04/11/86 | DK O/C w SGP re retention order | .4 hrs. |
| 04/14/86 | DK Redrafted order and application to retain P & F as counsel | 1 hr. |
| 04/18/86 | DK T/C to Joel Shafferson re signing of nunc pro tunc order of retention | .4 hrs. |

> Fifteen minutes total for all of these services would be more than sufficient for moderately experienced attorneys.[14]

We believe that this conclusion is completely unjustified. After reviewing all of the time records carefully, this Court "is left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), and holds that the Bankruptcy Court's finding that the PF & S time records were incredible is clearly erroneous and unsupported by the evidence.

The Bankruptcy Court's rejection of the time records was no doubt caused, at least

in part, by a mistaken notion held by that court regarding what information such records must contain as a matter of law. In *New York State Ass'n For Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983), the Court of Appeals declared: "any attorney ... who applies for court-ordered compensation in this Circuit for work done after the date of this opinion must document the application with contemporaneous time records." The court explained that, to comply with this rule, "*[t]hese records should specify, for each attorney, the date, the hours expended, and the nature of the work done.*" *Id.* (emphasis added). The Bankruptcy Rules of the Eastern District mirror this requirement in demanding a fee applicant to submit "*[i]n concise form*, a description of the services for which compensation is sought, including the nature of such services; [and] the time spent in the performance thereof, including time sheets or a summary thereof itemizing the dates upon which the services were rendered and the time spent on each date." Local Bankr.R. 39(6), E.D.N.Y. (emphasis added). The time records submitted by PF & S complied with the Second Circuit's requirement as set out in *Carey* and the requirement of Local Bankruptcy Rule 39(6) that they be "concise"—no more was required as a matter of law.

The Bankruptcy Court believed that the *time records* (as opposed to the fee application as a whole) should have been much more detailed, apparently convinced that its own "fee application checklist," to which it repeatedly referred, imposed such a duty on PF & S. This Court is not aware of what this fee application checklist is or what it entails, and at all events it is irrelevant to this case. Since local bankruptcy rules cannot alter federal law or the more general federal Bankruptcy Rules, *see, e.g.*, Bankr.R. 9029; *In re Walat*, 87 B.R. 408, 411 (Bankr.E.D.Va.1988); *Sunset Enterprises, Inc. v. B & B Coal Co., Inc.*, 38 B.R. 712, 715 (W.D. Va.1984); *In re Paula Saker & Co., Inc.*, 37 B.R. 802, 809–10 (Bankr.S.D.N.Y.1984); *In re River Transp. Co.*, 35 B.R. 556, 559–61 (Bankr.M.D.Tenn.

---

**14.** *Id.* at 5–6.

1983); and since the general Bankruptcy Rules themselves may not in turn "abridge, enlarge, or modify any substantive right," 28 U.S.C. § 2075 (1982); it follows *a fortiori* that the standing order, or "fee application checklist," of a single bankruptcy judge may not require time records to do more than "specify, for each attorney, the date, the hours expended, and the nature of the work done," *Carey,* 711 F.2d at 1148. This is so especially where a local bankruptcy rule requires such records to be *"concise."* [15] Consequently, the Bankruptcy Court erred in ruling that the time records were insufficient as a matter of law.

Finally, even if the Bankruptcy Court had been justified in abandoning the time records and the lodestar approach, its method of fee calculation violated the language and the policy of the Bankruptcy Code. Before the new Code was enacted, notions of economy prevailed in the award of attorney fees. *Manoa,* 853 F.2d at 689. "Trustees and attorneys were considered public officers and as such were not entitled to the same compensation for their services as they might have received in private employment." *Id.* This theory was abandoned under the Code, as evidenced by the legislative history surrounding § 330. *See* 124 Cong.Rec. 33,994 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 6505, 6511 ("Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code"). Accordingly, § 330 specifically provides that an award of attorney fees is to be based, at least in part, on "the cost of comparable services other than in a case under this title." 11 U.S.C. § 330(a)(1). The Bankruptcy Court's prepossession with "the *minimum*," therefore, was contrary to the letter and the spirit of the Code. While the Bankruptcy Court does have a responsibility to safeguard the assets of the estate in each particular case, awarding

fees according to some undefined notion of "the minimum" only chills § 330's more general goal of creating a competent, efficient, well-compensated bar of bankruptcy attorneys. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 329–30, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6286 ("Bankruptcy specialists ... if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.").

PF & S has asked the Court on appeal that it not remand this case if the Bankruptcy Court is reversed, but, rather, to modify the award so as to grant PF & S a "reasonable" attorney fee under § 330. In the interest of judicial economy, the Court accepts this invitation. *See Carey,* 711 F.2d 1136 (where, after reversing district court, appellate court went on to award "reasonable" attorney fee).

## C. *"Reasonable" Attorney Fees In This Case*

PF & S avers in its applications that during the three years on which it worked on the underlying bankruptcy case it charged $180 to $275 an hour for partners, $100 to $175 an hour for associates, and $50 to $60 dollars for paralegals. From these figures PF & S somehow comes up with a "mixed" hourly rate of $188.50 for all services across the board whether they were performed by a partner, an associate, or a paralegal.

Initially, the Court finds that, for the time period involved, these individual rates roughly, though fairly, reflect the prevailing market rate in this district for "the cost of comparable services other than in a [bankruptcy] case." 11 U.S.C. § 330(a)(1).

However there are problems with PF & S's applications. 1) This Court does not accept PF & S's "mixed" hourly rate of

---

**15.** The Court is aware of Bankr.R. 2016(a) which requires fee applications to set forth a "detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." This rule does not clash with Local Rule 39(6). Fee applications can, and should, be detailed *and* concise while

complying with *Carey.* PF & S's applications as a whole were detailed without being unnecessarily voluminous, and the time schedules obeyed *Carey's* mandate. The law "does not require a fee application the size of a boring victorian novel," *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E.D.Pa.1981).

$188.50. It is unable to determine how this figure was arrived at, and accepting it without such knowledge would fly in the face of the lodestar approach. 2) PF & S does not indicate *when* during the three year period they charged the rates indicated above. Thus, although it is clear that the lowest rate was charged at the beginning of the case (1986), and the highest rate was charged at the end of the case (1988), it is not clear *when* PF & S charged *what* it charged in between. 3) Furthermore, although the Court is informed that firm members Ira L. Herman and Steven D. Karlin were first billed out as associates and then, later, as partners, it is not revealed *when* this change took place. 4)

Finally, as stated above, the Court finds that some puffing on the time sheets occurred. For instance, *no* task is billed as less than 12 minutes, and *all* tasks are billed in even numbers. Consequently, as a matter of fairness the Court will construe against PF & S the ambiguities created by it in its applications. Accordingly the Court will accept the hours on the time records as is, but will use the lowest PF & S rate for both 1986 *and* 1987, the highest PF & S rate for 1988 only, and will award compensation for Herman and Karlin as if they were partners only in 1988. This method will best represent the number of hours reasonably worked on the case multiplied by the reasonable hourly rate.

### Attorney For Petitioning Creditors

**1986**

| | | | | | |
|---|---|---|---|---|---|
| Partners | 33.2 hrs. | × | $180/hr. | = | $ 5,976.00 |
| Associates | 57.4 hrs. | × | $100/hr. | = | $ 5,740.00 |
| Paralegals | .4 hr. | × | $ 50/hr. | = | $ 20.00 |
| | | | | | $11,736.00 |
| | | | | — (retainer) | $ 750.00 |
| | | | | | $10,986.00 |

### Attorney For Creditors' Committee

**1986 & 1987**

| | | | | | |
|---|---|---|---|---|---|
| Partners | 113.2 hrs. | × | $180/hr. | = | $20,376.00 |
| Associates | 83.4 hrs. | × | $100/hr. | = | $ 8,340.00 |
| Paralegals | 1.4 hrs. | × | $ 50/hr. | = | $ 70.00 |

**1988**

| | | | | | |
|---|---|---|---|---|---|
| Partners | 37.2 hrs. | × | $275/hr. | = | $10,230.00 |
| Associates | 0.0 hrs. | × | $175/hr. | = | $ 0.00 |
| Paralegals | 4.4 hrs. | × | $ 60/hr. | = | $ 264.00 |
| | | | | | $39,280.00 |

As no summary of costs was submitted in PF & S's application as counsel for Petitioning Creditors, costs are denied. The summary of $856 in costs submitted in PF & S's application as counsel to the Creditors' Committee is reasonable and is granted except for the $7 sought for transportation. *See* Local Bankr.R. 39(b), E.D.N.Y.

### CONCLUSION

In light of the foregoing, the decision and the order of the Bankruptcy Court are reversed. PF & S is awarded $10,986.00 in fees as attorneys for Petitioning Creditors and $39,280.00 in fees as attorneys for the Creditors' Committee, a total of $50,266.00. PF & S is also awarded reimbursement for costs of $849.

SO ORDERED.