**In re AMERICAN PREFERRED PRESCRIPTION, INC.,**
**Debtor.**

**Bankruptcy No. 893–84170–478.**

United States Bankruptcy Court,
E.D. New York.

March 9, 1998.

to perform accounting services on his behalf, filed a fee application seeking reimbursement from the estate of American Preferred Prescription, Inc. (the "Debtor") for professional fees and expenses incurred in this case. The Court had previously granted an interim award of the fees requested for professional services and scheduled a heating to determine whether BDO was entitled to be reimbursed for legal expenses the firm incurred in connection with its defense of a motion made by the Debtor to disqualify BDO. The Debtor had made the motion to disqualify BDO after BDO had completed the majority of the accounting work it had been retained to perform. Based on all of the pleadings herein, the hearings held, the Court's familiarity with the entire case, and this Court having concluded that the legal expenses incurred by BDO represent actual and necessary expenses, the Court grants BDO's request for expenses as set forth below. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure made applicable to this contested matter by Rule 9014.

Schwarzfeld, Ganfer & Shore by Alan Fried, New York City, for Debtor.

Hughes, Hubbard & Reed by David Wiltenburg, New York City, for Tracar, S.A.

Hahn & Hessen L.L.P. by Jeffrey Stein, Joshua I. Divack, New York City, for BDO Seidman, L.L.P.

Jaspan, Schlesinger, Silverman & Hoffman, Garden City, NY, for Kenneth Silverman.

## DECISION GRANTING APPLICATION OF BDO SEIDMAN, LLP FOR PAYMENT OF ATTORNEY'S FEES AS A NECESSARY EXPENSE

DOROTHY EISENBERG, Bankruptcy Judge.

BDO Seidman, LLP ("BDO"), which was officially retained by the Chapter 11 Trustee

### BACKGROUND

The Debtor is engaged in the business of a mail-order pharmacy and is currently operating from premises located at 50 Republic Road, Melville, New York, the same premises from which the Debtor's parent corporation and various affiliates are operated. On July 22, 1993, over four and one-half years ago, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, which filing came on the heels of a jury verdict entered in favor of Preferred RX, Inc. ("Preferred") against the Debtor, Ray Adiel, a former principal of the Debtor, and certain affiliates of the Debtor, including American Prescription Plan, Inc. ("AP Plan")[1] in the United States District Court for the Northern District of Ohio (the "Ohio Action"). The judgment was entered against the Debtor and the other defendants jointly

---

1. AP Plan is, according to the Debtor, a "sister" corporation of the Debtor. AP Plan has been deemed the alter ego of the Debtor, pursuant to findings made by Judge Conrad in the decision of *Cost Controls, Inc. v. American Preferred Prescription, Inc.*, Adv. Pro. No. 895–8419–346.

and severally for $1,122,643 in compensatory damages and $1 million in punitive damages on claims of breach of contract and fraud against Preferred, which is a competitor of the Debtor (the "Ohio Judgment"). Pursuant to a written agreement dated December 31, 1993, Preferred assigned its claims, including the Ohio Judgment to Cost Controls, Inc. ("CCI"). CCI and Preferred are related entities.

During the pendency of this case, the Debtor pursued an appeal of the decision rendered in the Ohio Action, and attempted to proceed with reorganization in this Court. The Debtor filed its first Disclosure Statement and Plan of Reorganization on February 25, 1994, which was rejected by this Court as unconfirmable pursuant to a hearing held on April 14, 1994. By this time, the Debtor's exclusivity had expired and as a result the Court entertained competing plans from various entities, including CCI.

While the Debtor was engaging in legal battle with CCI and others over the various proposed plans of reorganization, the Debtor filed an Order to Show Cause on April 29, 1994 to reject two non-residential leases entered into with Ryan Properties, Inc. and TPC Logistics Services, Inc. (collectively, the "Landlords") claiming that it had entered into a lease for other space. At a hearing held on May 13, 1994, the Court refused to grant the OSC until the Debtor had obtained Court authorization to enter into a lease for new space, pursuant to applicable bankruptcy rules and procedures. At this point, the Debtor advised the Court that it had already entered into a sublease with APP Plus, Inc. ("APP Plus")[2], for the space at 50 Republic Road, Melville, New York. As a result of the Debtor's unauthorized rejection of the leases and after ultimate Court approval, after notice and a hearing, of such lease rejections, the Landlords filed proofs of claim for damages. The Debtor commenced an adversary proceeding against the Landlords alleging that the Landlords' actions against the Debtor resulted in a constructive eviction of the Debtor, and sought damages in the amount of $300,000. The adversary proceeding was assigned to Judge Connelly for trial.

On February 7, 1995, the United States Court of Appeals for the Sixth Circuit reversed the Ohio Judgment as against the Debtor, leaving CCI with no apparent recourse against the Debtor on the Ohio cause of action. Undeterred, on August 8, 1995, CCI commenced an adversary proceeding against the Debtor seeking, *inter alia*, a judgment against the Debtor determining that the Debtor is responsible for, and should pay, CCI's claim against AP Plan as a result of the fraudulent conveyance of assets to the Debtor by AP Plan and/or under the theory that the Debtor is the alter ego of AP Plan.

While that litigation was wending its way to trial, on March 25, 1996, an order was entered confirming the Debtor's Third Amended Plan of Reorganization (the "Plan"). The Plan as confirmed, which is a final order of this Court, proposes to pay 100% of all allowed claims in which a final, non-appealable judgment has been rendered. The Plan further provides that any debts due to Marl Corporation ("Marl")[3] and other alleged secured creditors which support the Plan, together with the Debtor's affiliates and insiders are to be subordinated to the claims of the unsecured creditors, including CCI and the Landlords. Pursuant to the Plan, the Debtor deposited $2.5 million into an escrow account reserved for the payment of claims.

As a result of the purchase of unsecured claims in excess of $256,000 by Marl and another entity either friendly with or related to the Debtor, the only outstanding non-insider unsecured claims in excess of $5,000 which were unpaid as of the confirmation date and are still unpaid are those held by (i) Moshe Katlowitz, an attorney who claims entitlement to payment for legal work performed for the Debtor prepetition in the

---

2. APP Plus is the Debtor's parent corporation which owns all of the stock of the Debtor, is operated by the same parties who control the Debtor, and is an affiliate as defined by Section 101(2)(B) of the Bankruptcy Code.

3. Marl is described in the Plan as a corporation which is "friendly" to the Debtor's principals.

approximate sum of $13,000,[4] (ii) the Landlords,[5] (iii) CCI, and (iv) Charles Hutson, a former consultant to the Debtor.[6] All of these claims are disputed by the Debtor and have been and continue to be subject to continuing litigation.

After a lengthy trial conducted before the Honorable Francis G. Conrad in February and March 1997, and by Decision dated March 21, 1997, CCI was awarded a judgment against the Debtor based on fraud and alter ego claims. CCI was awarded $2,970,-000 in compensatory damages and punitive damages equal to three times the compensatory damages. Judge Conrad found that the principals and parties in control of the Debtor had provided false testimony, had committed serious fraudulent acts where various assets were transferred from AP Plan to the Debtor including $3.9 million in sales, and that the transfers of assets to the Debtor were made without fair consideration, were made in bad faith, and were made with actual intent to hinder, delay or defraud CCI in violation of New York's Debtor and Creditor Law. As part of the judgment, CCI was also awarded up to $1 million as reimbursement of its attorneys fees. CCI presently has a claim for approximately $13 million against the Debtor. The Debtor has appealed the entire decision including the attorneys fee award, which appeals are pending in the United States District Court for the Eastern District of New York. The Debtor has drained the entire escrow fund established pursuant to the Plan to pay the compensatory damages in full. The punitive damages portion of the award has been bonded in the amount of $2 million and collection thereof has been stayed.

Based in part on the findings made by Judge Conrad in his decision, a joint Order to Show Cause was filed by CCI and the Landlords seeking the appointment of a Chapter 11 Trustee pursuant to Section 1104

of the Code. After holding a hearing and taking testimony, the Court granted the motion and on April 11, 1997, this Court signed an order appointing Kenneth Silverman as the Chapter 11 Trustee of the Debtor with limited powers, charged with the supervision of the Debtor's non-ordinary course business decisions, and was directed to investigate transactions among the Debtor and its affiliates. The Debtor at the time was a substantial provider of mail order drugs having annual gross sales of approximately $30,447,-000.

The focus of the Chapter 11 Trustee's initial appointment was that of investigation of the Debtor's business, intercompany transfers and transactions and supervision of its management affairs, in order to preserve the substantial value of this Debtor's business. It was intended that the Debtor's officers would cooperate with the Trustee so that the Debtor could conduct its business in the ordinary course while the Trustee performed its oversight and investigative duties pending a final determination of the disputed claims.

As the case continued, the Court became painfully aware that the Debtor still appeared ready to litigate every and any issue, rather than negotiate a reasonable settlement with any of its disputed creditors. Recognizing that the Court had confirmed the Debtor's Plan over eighteen months ago, with no foreseeable date in view wherein a final decree would be filed, and because the Debtor had indicated it had no intention of settling any disputed claims, upon the Chapter 11 Trustee's motion, the Court enlarged the Chapter 11 Trustee's powers, authorizing him to negotiate settlements with various claimants of the Debtor and bring the settlements before the Court for the Court's approval upon notice and hearing to all parties in interest.

On August 1, 1997, the Chapter 11 Trustee and the Landlords filed an Order to Show

---

4. The Debtor's motion objecting to the claim filed by Katlowitz was recently restored to the Court's calendar, and a hearing is to be scheduled.

5. The Landlords have assigned their claims to Jane Ehrler, a principal of the Landlords.

6. The Debtor had commenced an adversary proceeding against Charles Hutson regarding his claim in the amount of $29,888.90 based on the theory of wrongful termination of a joint venture agreement, and the adversary proceeding has been removed to state court where it is currently pending.

684

Cause seeking to settle the action commenced by the Debtor against the Landlords pending before Judge Connelly. The Chapter 11 Trustee assessed the evidence adduced at trial and took note that during the course of that trial (I) the Landlords' summary judgment motion on the Debtor's constructive eviction action had been granted by Judge Connelly, thereby eviscerating the Debtor's action as a whole, (ii) Alan Fried, Esq. and the firm of Schwarzfeld Ganfer & Shore had been disqualified from representing the Debtor in the Landlord action as a result of improper conduct in that action, and (iii) Judge Connelly had directed the parties to attempt to settle the action. The Chapter 11 Trustee agreed to settle the action by consenting to entry of a judgment in favor of the Landlords in the amount of $705,000. Clearly, the Chapter 11 Trustee believed that settling the matter was more prudent than awaiting a decision from Judge Connelly, which could have exposed the Debtor to even greater liability based on the Chapter 11 Trustee's assessment of the merits of the action. The settlement was approved by Judge Connelly, and an order and judgment was entered against the Debtor on August 15, 1998. As with all other disputed creditors, the Debtor has appealed the settlement order.

### FACTS

By application dated May 5, 1997, together with an affidavit of no adverse interest held by BDO, the Chapter 11 Trustee sought an order from this Court appointing BDO as its accountants. Retention of competent, qualified accountants was necessary to assist the Chapter 11 Trustee with the review of the Debtor's and the affiliate's books and records, which apparently reflect a consistent, substantial intermingling of assets and financial affairs. Prior to the retention of BDO and in connection with the ultimate selection of BDO as the accountants, BDO performed a conflicts check to determine whether a conflict existed which would preclude the firm from acting as the accountants for the Chapter 11 Trustee. The conflicts check did not reveal any impediment to their retention because BDO had never performed any work for the Debtor or its affiliates at any time.

On June 2, 1997, BDO received from the Chapter 11 Trustee a letter dated May 30, 1997 from Alan Fried, Esq., the Debtor's counsel, in which it was stated that the Debtor had recently learned that BDO was the accountant for Health Management, Inc. ("HMI"). The letter further stated that HMI was a direct business competitor of the Debtor, and that the Debtor was the plaintiff in litigation against HMI concerning, among other things, the veracity of statements contained in HMI's financial statements which had been audited by BDO. The Court notes that before the Debtor's plan of reorganization had been confirmed, HMI was named as the party that would manage the Debtor in connection with a competing plan of reorganization proposed by CCI. The Court was presented with HMI's SEC filings and their audited financial statements as part of the competing plan submitted by CCI. That competing plan was never approved by the Court. Thereafter, the Debtor commenced an action in State Court against HMI alleging, among other allegations, that HMI submitted false financial statements. In addition, a shareholders derivative action was commenced by certain unrelated shareholders against HMI and BDO based on allegations that false financial statements had been prepared by HMI and audited by BDO. The Debtor alleges that BDO will be a material witness in both cases, and may even become a defendant in the Debtor's action against HMI. As a result, the Debtor alleged that BDO's relationship with HMI prior to and during its retention by the Chapter 11 Trustee created a conflict of interest that should have precluded BDO's retention in the Debtor's Chapter 11 case, and that BDO was not disinterested because it had a financial stake, as a potential defendant, in the litigation commenced by the Debtor against HMI.

Upon discovery by BDO that certain members and employees in its Chicago office had performed work for HMI, BDO put into place a "Chinese wall" to prevent any exchange of information between the Chicago employees performing work for HMI and the New York employees who were assisting the Chapter 11 Trustee in reviewing the Debtor's books and records. Thereafter, on June 10,

1997, the Debtor made a motion seeking to disqualify BDO from being retained as accountants to the Chapter 11 Trustee based on the above facts and based on allegations by the Debtor that BDO was attempting to use confidential information garnered from the work performed by the Chapter 11 Trustee to market itself as a specialist for pharmaceutical companies like the Debtor (the "Disqualification Motion"). The Debtor also sought an order precluding BDO from revealing any information obtained regarding the Debtor to any entity other than the Chapter 11 Trustee and the Court.

The allegations made by the Debtor in the Disqualification Motion were serious, and as a result, BDO was constrained to retain qualified counsel, Hahn & Hessen LLP ("Hahn & Hessen"), to represent its interests in connection with the Disqualification Motion. On July 22, 1997, this Court held a hearing to consider the Disqualification Motion (the "Hearing"). At the Hearing, the Court heard testimony by William Lenhart, CPA, a member of BDO responsible for the firm's retention by the Chapter 11 Trustee. Lenhart verified that a conflicts check was performed and no conflicts were reported. Lenhart further testified that even if the check had revealed the existence of the litigation between the Debtor and HMI, no conflict was perceived to exist merely because BDO performed accounting work for an entity which was involved in a lawsuit with the Debtor, where the circumstances surrounding the lawsuit had no bearing on the work to be performed by BDO as accountants to the Chapter 11 Trustee.

In the supporting affidavits of Eleanor Adiel, a former principal of the Debtor, and John Ryan, the Debtor's Vice President and Controller, the Debtor alleged that the "questions and interviews of BDO's employees made it quite clear that the individuals working on the Debtor's matter are acutely aware of HMI and the issues which have led to its downfall." When Ryan was questioned at the Hearing, he could point to nothing concrete in support of this contention. The only statements made by employees of BDO to Ryan which even remotely resembled such acute awareness was a question addressed to

Ryan as to whether the Debtor was a mail-order pharmacy like HMI, and some vague discussion as to how the Debtor collects its third-party receivables. With regard to the allegations that BDO was holding itself out as an expert in the field of the pharmaceutical business based on the information it collected from the Debtor, the Debtor could only point to an advertisement carried on the Interact in which BDO claims expertise in various areas that are designed to meet the challenges of its clients. The Court found that the Debtor's allegations of conflict of interest and/or that BDO had an interest adverse to that of the Debtor were not supported by any evidence presented to the Court by the Debtor.

After hearing all the testimony provided by the Debtor which did not support any of the allegations contained in the Disqualification Motion, the Court concluded that the failure to disclose the relationship between HMI and BDO did not create a conflict which would preclude BDO's retention by the Chapter 11 Trustee as accountants for the Trustee. Even if it were discovered at the time the conflicts check was performed that BDO had performed accounting service for HMI and this was revealed in BDO's affidavit, the Court would not have disqualified BDO because such relationship would not have affected BDO's status as a disinterested party, which neither held nor represented interests adverse to the Debtor's estate. BDO was being retained by the Chapter 11 Trustee merely to review the Debtor's books and records and to report its findings to the Chapter 11 Trustee and the Court regarding the Debtor's financial affairs and arrangements with its affiliates. Therefore, the Court denied the portion of the Debtor's motion seeking to disqualify BDO, but did grant the portion of the motion seeking to preclude BDO from disclosing any information regarding the Debtor to any party other than the Chapter 11 Trustee or the Court. Such relief was granted as a "comfort order" since BDO is required to maintain the confidentiality of its review pursuant to the Code of Professional Conduct promulgated by the American Institute of Certified Public Accountants. It was placed in the form of an order to provide the Debtor with additional

support for sanctions in the event the Debtor could later prove to the Court that BDO had violated the Code of Professional Conduct.

An order was entered on August 1, 1997 memorializing this decision, and is the subject of a pending appeal by the Debtor to the United States District Court for the Eastern District of New York. Hahn & Hessen is counsel to BDO for the purpose of defending the appeal.

On November 19, 1997, BDO filed a fee application for interim compensation in the amount of $141,292.50 and reimbursement of expenses in the amount of $25,375.96. The requested expenses include $23,057.32 as reimbursement of legal fees and expenses of Hahn & Hessen incurred by BDO in its successful defense of the Disqualification Motion (the "Defense Costs"). The Debtor and Tracar, S.A., an alleged secured creditor of the Debtor, objected to the reimbursement of the Defense Costs and to other portions of the fee request. The Court held a heating on December 9, 1997 and allowed to BDO as an interim fee award the sum of $70,000. The Court deferred consideration of the remaining fees and expenses to a later date. The Court further directed the parties to brief the issue of whether BDO is entitled to reimbursement of the Defense Costs as an actual and necessary expense incurred in connection with the work performed by BDO on behalf of the Chapter 11 Trustee. This issue is the only issue before the Court at this time.

### DISCUSSION

Section 330(a)(1) of the Bankruptcy Code provides that "the court may award to a . . . professional person employed under section 327 or 1103—(A) reasonable compensation for actual, necessary services rendered by the . . . professional person . . . and (B) reimbursement for actual, necessary expenses." While the issue of whether an accountant retained pursuant to Section 327(a) of the Bankruptcy Code may be reimbursed from the Debtor's estate for legal fees and expenses incurred in connection with defending a motion for disqualification is one of first impression in the Second Circuit, and this issue has sent the parties scrambling to come

up with case law from which to draw analogies, this Court finds that the answer is a simple and straightforward one, given the facts and background of this particular case.

■ The Court rejects the Debtor's argument that absent entry of an order approving the retention of Hahn & Hessen as counsel to BDO, that BDO cannot be reimbursed for the Defense Costs. The Debtor appears to be confusing the issue of whether a professional may be reimbursed from the Debtor's estate for performing professional services without obtaining a prior order of retention with the issue of whether BDO can be reimbursed for costs it incurred in connection with the performance of its duties as spelled out in its Order of Retention. Section 327(a) of the Code clearly provides that where a trustee, creditors' committee, or a debtor-in-possession seeks to employ a professional person, a prior order of retention is required. However, this is not a case where the Chapter 11 Trustee has retained a professional to perform work on behalf of the Debtor's estate and has neglected to obtain a proper retention order. In this case, BDO was not required to obtain Bankruptcy Court approval prior to employing counsel to represent it in a dispute over BDO's retention and possible removal because of a conflict of interest. *In re Met–L–Wood Corp.*, 115 B.R. 133 (N.D.Ill.1990). BDO merely seeks Court authorization for payment of the Defense Costs, which it necessarily incurred in connection with the work performed on behalf of the Trustee. The fact that the costs incurred by BDO were in the nature of legal fees and such incidental costs does not change the Court's analysis. Such expense is to be scrutinized as would any other expense, in the context of this case. The Court believes that the only question it must answer is whether this charge constitutes an actual and necessary expense.

■ The Court is aware that the burden of establishing entitlement to reimbursement for expenses falls on the applicant. *Matter of Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir.1989); *In re Spanjer Brothers, Inc.*, 203 B.R. 85, 91 (Bankr.N.D.Ill.1996); and *In re STN Enterprises*, 70 B.R. 823, 834 (Bankr. D.Vt.1987). An expense is deemed necessary

if it was "incurred because it was required to accomplish the proper representation of the client." *In re Spanjer Brothers, Inc.,* 203 B.R. at 91. In addition, each expense must be properly documented with enough specificity to permit the Court to evaluate the expense. *In re STN Enterprises,* 70 B.R. at 834. There is no doubt that the expenses incurred by BDO have been properly documented and this Court has no difficulty in reviewing the expenses to make its determination. A review of the relevant facts reveals that the Defense Costs were not only necessary, but they were critical to BDO's proper execution of its duties as requested by the Chapter 11 Trustee, who was BDO's client.

█ In this case, an analysis of whether BDO's Defense Costs are to be reimbursed by the Debtor's estate begins with a careful review of the actions precipitating the expense in question. The Debtor's Plan was confirmed almost two years ago, and the Debtor has been in this Court for almost five years. The Debtor has zealously litigated almost every issue raised in this case. While the Debtor certainly has a right to litigate matters and to pursue appeals of unfavorable decisions, such actions have not always inured to the estate's ultimate benefit. Such is the case regarding the Disqualification Motion and the impact it has on BDO's request for reimbursement of expenses.

In this instance, the Debtor brought on the Disqualification Motion, alleging that BDO was not a "disinterested" party as required by the Bankruptcy Code. Given that BDO had already performed the lion's share of its work, the allegations were serious and had the potential to greatly impact BDO financially. In addition, the disqualification of BDO would have affected the Chapter 11 Trustee in the performance of his duties, requiring him to obtain another qualified accounting firm which would then have to commence its financial review from scratch. Clearly, BDO felt the need to address the issues raised by the Debtor, and sought outside counsel to respond to the allegations. At trial, the testimony revealed that the Debtor's allegations were based on (i) claims made in an advertisement published by BDO on the Interact that BDO had expertise in various areas designed to meet the challenges of its clients, (ii) statements made by employees of BDO to employees of the Debtor that HMI and the Debtor were both in the pharmaceutical business, and (iii) a belief that BDO had an "ax to grind" with respect to the Debtor because the Debtor was involved in litigation with a third party in which financial reports audited by BDO were at issue.

The evidence adduced at the Disqualification Heating served to expose to the Court that there was no merit to the Disqualification Motion. The Disqualification Motion was denied, and the Court's ruling that BDO could not disclose any confidential information to any third party should not be taken by the Debtor to be a vindication of its actions in any respect. The Court was merely stating what BDO already had an obligation to do, and in fact was specifically mandated by its own Code of Professional Conduct. *See* Rule 301, Code of Professional Conduct of the American Institute of Certified Public Accountants, which provides that "[a] member in public practice shall not disclose any confidential client information without the specific consent of the client."

The fact that the Debtor's own action caused BDO to incur the Defense Costs is critical to the Court's analysis. The concept that the Debtor's own actions can cause the estate to incur additional expense in this context is supported by relevant case law. In the case of *In re Met–L–Wood Corporation,* 103 B.R. 972 (Bankr.N.D.Ill.1989), *aff'd,* 115 B.R. 133 (N.D.Ill.1990), the Bankruptcy Court for the Northern District of Illinois came to the same conclusion based on similar facts. In *Met–L–Wood Corporation,* a Chapter 11 debtor had sold its assets to a third party during the pendency of the case. Thereafter, the creditors' committee conducted an investigation into the sale, and the case was converted to a case under Chapter 7. The Chapter 7 Trustee commenced an investigation of the sale, and took numerous actions against the law firm representing the debtor, including a motion to disqualify the law firm and an investigation against one of the partners of the firm representing the

Debtor for allegedly perpetrating a fraud on the bankruptcy court. The Chapter 7 trustee was unsuccessful in all of his endeavors, and ultimately admitted that the law firm was not involved in any fraud in the case. The debtor's law firm had retained the law firm of Jenner & Block to represent it in defending the Chapter 7 Trustee's various actions, and sought reimbursement from the estate for the legal costs incurred. The Bankruptcy Court found that under the principal of fundamental fairness, the legal fees of Jenner & Block would be allowed as an extraordinary administrative expense. 103 B.R. at 976, 977. Although the Debtor has not made an admission that the Disqualification Motion was unwarranted, this Court finds that the Disqualification Motion was baseless. The Bankruptcy Court in *Met–L–Wood Corporation* based its legal analysis in part on the case of *Reading Co. v. Brown,* 391 U.S. 471, 479, 88 S.Ct. 1759, 1763, 20 L.Ed.2d 751 (1968) in which the Supreme Court stated that persons "subjected to loss and expense as a result of the administration of a bankruptcy estate are entitled to be made whole as a matter of fundamental fairness and will be allowed administrative expense claims to implement that result." The rationale of *Reading* has been expanded to cover many arenas, including claims arising from environmental damages and frivolous litigation commenced by a debtor. *See In re E.A. Nord Co., Inc.,* 78 B.R. 289 (Bankr. W.D.Wash.1987) (award of fees and costs in arbitration decision as a result of frivolous claims litigation commenced by debtor postpetition deemed an administration expense). The common thread running through these cases and in the case at hand is that the debtor in question has caused an injury to a third party for which the estate must be held responsible. Clearly, fundamental fairness dictates the same result in this case.

The Debtor has prospered during the five years this case has been pending, and has even increased its overall value. The Court believes that whether the Debtor continues in Chapter 11 or the case is converted to a case under Chapter 7, there will be sufficient assets from which to pay all creditors the full amounts of their claims. However, the Court is attempting to preserve the assets and the business of the Debtor as a Chapter 11 debtor, so that the employees and the principals of the debtor may obtain the benefit of the ongoing business and its good will after all debts are paid pursuant to the Plan. However, the Court cannot condone the persistent and continuous conflict and confrontation created by the Debtor and its principals toward its adverse creditors, the Chapter 11 Trustee and the Chapter 11 Trustee's retained professionals when its allegations are based on anecdotal charges which cannot be supported by actual evidence. The Debtor acts at its own peril, which may, as it does in this decision, result in additional costs to the Debtor's estate.

In sum, this Court finds that the Disqualification Motion was frivolous and was lacking in any legal or factual basis. As such, the Defense Costs incurred by BDO were a necessary expense, which could have been entirely avoided had the Debtor not made such a baseless unsupported motion. Based on all of the events which have transpired in this case, the Court concludes that the Disqualification Motion was most likely brought solely to delay the proceedings and to hinder the Chapter 11 Trustee. The Defense Costs were an actual and necessary expense incurred by BDO in order to perform its duties, and BDO shall receive reimbursement in full, except for any legal fees and costs incurred in connection with defending the Debtor's appeal of this Court's decision on the Disqualification Motion. Those fees and costs incurred in connection with the appeal shall be reviewed by this Court upon completion of the appeals process. At that time, the Court shall hold an additional hearing to consider whether BDO may be reimbursed for those expenses.

## CONCLUSION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

3. The Court finds that the Defense Costs are actual and necessary expenses incurred by BDO in connection with the work

performed on behalf of the Chapter 11 Trustee pursuant to 11 U.S.C. § 330(a)(1)(B).

4. BDO's request for expenses in the amount of $25,375.96 is granted excluding the portion representing legal fees and expenses incurred in connection with defense of the appeal filed by the Debtor of the order denying the Disqualification Motion.

5. The Court shall schedule a further hearing to determine whether BDO shall be reimbursed for the legal fees and expenses incurred in connection with defense of the appeal upon conclusion of the appeals process.

6. An Order incorporating the decision herein shall be entered simultaneously with this decision.