## In re THE KOREA CHOSUN DAILY TIMES, INC., Debtor.

### No. 03–25450–ess.

United States Bankruptcy Court, E.D. New York.

Dec. 13, 2005.

---

Daniel K. Lee, Law Office of Daniel K. Lee, Palisades Park, NJ, for Debtor.

## MEMORANDUM DECISION GRANTING IN PART THE APPLICATION FOR COMPENSATION FOR ATTORNEY FOR THE DEBTOR

ELIZABETH S. STONG, Bankruptcy Judge.

Before the Court is the application of Raymond J. Aab, former attorney for The Korea Chosun Daily Times, Inc., the debtor in the above-captioned Chapter 11 case (the "Debtor"), for compensation for his fees and expenses pursuant to Sections 330 and 331 of the Bankruptcy Code (the "Fee Application"). Mr. Aab is seeking approval of total compensation of $189,897.50 in fees, $4,199.14 in expenses, and a $25,000 bonus in consideration of the difficulty of the case and the outcome achieved. The Debtor objects to the Fee Application on grounds that Mr. Aab failed adequately to perform his services to the Debtor and was an obstacle to numerous potential transactions. For the reasons reflected in the record and discussed below, the Fee Application is granted in part.

### *Background*

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on November 20, 2003, and was continued thereafter as debtor and debtor-in-possession in the management and operation of its business. The Debtor's principal asset was a commercial building of 18,000 square feet at 12–12 Queens Plaza South, Long Island City, New York (the "Property"). The Debtor also published the United States edition of a Korean daily newspaper, but ceased that activity in October 2002. The Debtor purchased the Property in August 2001, and gave a mortgage to Nara Bank, N.A. ("Nara Bank") in the principal amount of $1,250,000. The Debtor defaulted on this mortgage in March 2002, and in August 2003, Nara Bank obtained a judgment of foreclosure. The foreclosure sale was scheduled for November 21, 2003, but was stayed by the Debtor's bankruptcy filing.

Mr. Aab was retained by the Debtor as its attorney pursuant to a written agreement to compensate him for his time at a rate of $325 per hour and for expenses. He received a retainer of $15,000 from the Debtor at that time. Fee Application at 9. Mr. Aab's retention as attorney for the Debtor was approved by the Court by Order dated January 21, 2004. Docket Entry 10. Mr. Aab requested to be relieved as attorney for the Debtor, and the Debtor sought approval from the Court to retain substitute counsel. *See* Letter to Mr. Aab filed by Kyo Jong Kim, Docket Entry 124; Application to Employ Daniel K. Lee as Attorney for the Debtor, Docket Entry 125. After a hearing on August 3, 2005, the Debtor's application was granted, and Daniel Lee, Esq., was retained as new counsel for the Debtor, by Order dated August 30, 2005. Docket Entry 140.

After filing for bankruptcy, and during Mr. Aab's tenure as attorney for the Debtor, the Debtor pursued several different financing arrangements with the objective of recapitalizing the Debtor's business, avoiding foreclosure by Nara Bank on the Property, and restarting the Debtor's newspaper business. In addition, the Debtor was required to respond to a motion for relief from the automatic stay with respect to the Property, filed by Nara Bank on February 23, 2004, a motion to dismiss the case or in the alternative, to convert it to a case under Chapter 7 of the Bankruptcy Code, filed by the United States Trustee on November 22, 2004, and a motion to convert the case to one under Chapter 7 or in the alternative, to appoint a trustee, also filed by the United States Trustee on August 5, 2005, which motion is still pending before the Court. Ultimately, the Property was sold to House of

Realty Inc. on September 27, 2005, for $4.6 million, following the entry of an Order approving the sale of substantially all of the Debtor's assets on September 20, 2005 (the "Sale Order"). It appears that the sale will allow the Debtor to pay all administrative expenses and creditors in full, and to return a surplus to the Debtor's principal, Kyo Jong Kim.

Both Mr. Aab, in support of the Fee Application, and the Debtor, in opposing it, point to the longevity of this Chapter 11 case and the Debtor's numerous attempts to refinance or sell the Property and restart its business operations during this period through different proposed financing and leasing arrangements. Mr. Aab argues that he is entitled to a bonus, in recognition of his ability to sustain the case and reach the point of a profitable sale despite repeated financing and leasing efforts that were not consummated. The Debtor argues that the protracted nature of the case and the repeated failures of the Debtor to close on refinancing and other transactions result from and illustrate the problems with Mr. Aab's services.

The first proposed transaction was detailed in the Debtor's initial proposed Plan of Reorganization filed on May 17, 2004, and contemplated that the Debtor would borrow $2.1 million from HMC Capital Funding Corp. ("HMC"), creating a confirmation fund from which the Debtor would pay creditors (the "HMC Proposal"). On May 20, 2004, the Debtor filed a motion seeking authorization to enter into a lease with K–Nine Solutions, Inc. ("K–Nine Solutions"), for 7,500 square feet of the Property (the "Lease Motion"). The Lease Motion indicated that the HMC Proposal was contingent upon the Debtor leasing the entire 18,000 square foot area of the Property. Lease Motion ¶¶ 5–6. The Lease Motion was subsequently withdrawn

by a letter to the Court on June 25, 2004. Docket Entry 51.

The next proposed transaction was a refinancing with Eastern Savings Bank ("ESB"). On September 13, 2004, the Debtor filed a motion seeking authorization to borrow $1.8 million from ESB to be secured by a new mortgage on the Property (the "ESB Proposal"). Docket Entry 61. Under the ESB Proposal, ESB would refinance the existing mortgages, including the Nara Bank mortgage, in the amount of $1.8 million, ESB would take an assignment of existing mortgages on the Property, and a closing would occur promptly. After the ESB financing was in place, the Debtor planned to develop a twenty-one story luxury residential condominium building on the Property in conjunction with Pioneer & Developer Group U.S.A. ("P & D"). The ESB Proposal called for the Debtor, through P & D, to provide a $300,000 debt service guarantee, and for a closing to take place by September 30, 2004. *See* Debtor's Motion for an Order Authorizing It To Refinance with ESB, Docket Entry 61.

The ESB Proposal was never consummated. By letter dated October 21, 2004, Mr. Aab reported to the Court that the Debtor was not able to make a $7,500 payment, required by ESB to extend the loan commitment beyond its expiration date. Docket Entry 71. But in late November 2004, the ESB Proposal was resuscitated. Appended to the Debtor's proposed order authorizing the Debtor to refinance, filed on December 6, 2004, was an amendment to the ESB loan commitment, dated November 22, 2004, extending the commitment through December 20, 2004, requiring an additional $3,000 commitment fee, and requiring P & D to deposit $150,000 in an interest reserve prior to closing. Docket Entry 78. This financing arrangement was approved by the

Court by Order dated December 7, 2004, and Amended Order dated December 8, 2004. Docket Entries 81, 83. Notwithstanding the extension of ESB's loan commitment, the loan again did not close.

The third proposed transaction was a refinancing with Kennedy Funding, Inc. ("KFI"). By motion dated January 20, 2005, the Debtor sought Court permission to obtain financing from KFI (the "KFI Proposal"). The KFI Proposal would provide the Debtor with post-petition secured financing of $2.2 million, later increased to $2.4 million, to be used to satisfy the Nara Bank mortgage and other secured claims on the Property. The KFI Proposal was approved by the Court by Order (1) Authorizing Debtor to Obtain Post–Petition Secured Financing and Grant Senior and Second Liens; (2) Authorizing Payments from Proceeds of Financing; (3) Modifying the Automatic Stay; and (4) Granting Related Relief, entered on March 30, 2005. Docket Entry 102.

As with the ESB Proposal, the closing of the KFI Proposal was extended several times and ultimately, the KFI Proposal was never consummated. Initially, the closing was scheduled for April 8, 2005. A Consent Order, dated April 14, 2005, extended the closing date to April 15, 2005. Docket Entry 105. On June 29, 2005, the Court entered a second Consent Order, extending the closing date to July 15, 2005. Docket Entry 111. On July 15, 2005, Mr. Aab informed the Court, by letter, of an offer to purchase the Property and indicated that he had notified the parties that he would no longer be representing the Debtor in connection with the KFI Proposal (the "July 15 Letter"). Following the July 15 Letter, Mr. Aab sought to be relieved as the Debtor's counsel, and Mr. Lee was substituted as counsel effective August 30, 2005. *See* Docket Entries 124, 125, 140.

With its new counsel, the Debtor elected to continue with the proposed sale of the Property and the KFI Proposal was abandoned. That sale, the Debtor's fourth proposed transaction, was brokered by Kaplon–Belo Associates, Inc. ("Kaplon–Belo"). By Stipulation and Order dated August 31, 2005, Kaplon–Belo was retained *nunc pro tunc* as of June 10, 2005. Docket Entry 141. On September 19, 2005, the Debtor filed a proposed Chapter 11 plan of liquidation and, pursuant to the Sale Order, the Debtor sold the Property to House of Realty Inc. on September 27, 2005, for $4.6 million. Docket Entries 152, 154.

This Fee Application was brought by notice of motion dated September 19, 2005, and was considered at a hearing on October 18, 2005, and an adjourned hearing on November 16, 2005, at which Mr. Aab, the Debtor, the Debtor's current counsel and the United States Trustee appeared and were heard. On October 5, 2005, the Debtor filed an affidavit of its principal, Mr. Kim, opposing Mr. Aab's fee application in its entirety (the "Debtor's Opposition"). At the invitation of the Court, the United States Trustee filed a statement of its position on the Fee Application on October 27, 2005 (the "UST Statement"), opposing that portion of the Fee Application not supported by time records of Mr. Aab and the request for a bonus, but having no objection to that portion of the Fee Application that seeks fees and reimbursement of expenses in the amount of $182,097.50. UST Statement at 7.

### *Discussion*

■ Attorneys for debtors-in-possession may be awarded fees and reimbursement of expenses pursuant to Section 330 of the Bankruptcy Code. 3 COLLIER ON BANKRUPTCY ¶ 330.03[3][a] at 330–24 (15th ed.1995). Section 330 permits the Court to award

"reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1).

In determining the necessity of services rendered, the Bankruptcy Code directs courts to consider "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C). The Second Circuit further indicates that the "reasonably likely to benefit the estate" test in Section 330(a)(3)(C) should be applied in an objective manner, based upon the services a reasonable lawyer would have performed under the same circumstances. *In re Ames Department Stores, Inc.*, 76 F.3d 66, 71 (2d Cir.1996).

In addition to ascertaining whether the services rendered were necessary, the Court must determine whether the fees requested are reasonable. In doing so, the Court must consider:

> (A) the time spent on such services; (B) the rate charged for such services; ... (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and (E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practioners in cases other than [bankruptcy cases].

11 U.S.C. § 330(a)(3).

The prevailing method for weighing these factors is the "lodestar" approach. "The lodestar amount represents the number of hours reasonably worked on a case multiplied by the reasonable hourly rate."

*Wells v. Bowen*, 855 F.2d 37, 43 (2d Cir. 1988), citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). *See also Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir.1973). Indeed, as one court in this District has held, "[i]t is now settled that the 'lodestar' method of fee calculation ... is *the* method to be used to determine a 'reasonable' attorney fee in all the federal courts, including the bankruptcy courts." *Matter of Cena's Fine Furniture, Inc.*, 109 B.R. 575, 581 (E.D.N.Y.1990) (emphasis in the original) (citing cases).

*The Applicant's Records*

The applicant for an award of compensation under Section 330 bears the burden of providing "records [that] specify, for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983). *See also* E.D.N.Y. LBR 2016–1, adopting the fee guidelines promulgated by the Office of the United States Trustee (Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330, *reprinted in* 28 C.F.R. Part 58, Appendix) (the "UST Guidelines").

With respect to Mr. Aab's request for compensation for his recorded time, the Fee Application complies with the requirements set forth in *Carey*, as well as this District's Local Bankruptcy Rules, and the UST Guidelines. As stated in the UST Guidelines, "[t]he fee application should ... contain sufficient information about the case and the applicant so that the Court ... can review it without searching for relevant information in other documents." UST Guidelines (b). The Fee Application describes the significant

procedural and substantive milestones in the Debtor's bankruptcy case. *See* Fee Application ¶¶ 2–14. The Fee Application also sets forth Mr. Aab's considerable expertise and credentials, which include over twenty-five years of bankruptcy experience. *See* Fee Application ¶ 8. Finally, the Fee Application includes both a narrative description of the hours spent and Mr. Aab's contemporaneous time records. *See* Fee Application ¶ 9 and Exhibit E. Based on the entire record, the Court finds that the records in support of the Fee Application are adequate.

*The Reasonableness of the Hours Expended*

 In determining the reasonableness of the hours expended, the Court must exclude time that is "excessive, redundant or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see also In re Sucre*, 226 B.R. 340, 352 (Bankr. S.D.N.Y.1998) (applying *Hensley* ). In doing so, the Court must not penalize attorneys by viewing the efforts of counsel with the benefit of "20/20 hindsight." *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 23 (Bankr.S.D.N.Y.1991). "[H]ours for an activity or project should be disallowed only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive." *Id.* This supports the salutary objective that attorneys should not be deterred from undertaking the representation of debtors in bankruptcy cases, including cases that may pose significant challenges and an uncertain outcome, due to a risk of inadequate compensation. *In re Ames Department Stores, Inc.*, 76 F.3d at 72 (citing *Matter of UNR Indus., Inc.*, 986 F.2d 207, 210 (7th Cir.1993)).

The Fee Application shows that compensation is sought for more than 560 hours of Mr. Aab's time. *See* Fee Application ¶ 14. There can be no doubt that this is a large number of hours, requiring careful and thoughtful scrutiny by the Court. The record of this case shows that over the twenty-two months comprehended by the Fee Application, some thirty filings were made by the Debtor, at least twenty hearings were held, and some 182 entries were made on the Court's docket. And, as described above, no less than three different refinancing arrangements were proposed, numerous modifications to those arrangements were made, and ultimately, a fourth transaction was entered into. *See* pp. 764–765, *supra*. That is, both in court and elsewhere, this matter was active over an extended period of time. Further, the record does not show that Mr. Aab is seeking compensation for "excessive, redundant or otherwise unnecessary" services. *In re Sucre*, 226 B.R. at 352. Billing practices that have been looked upon with disfavor in other bankruptcy cases are not evident in the Fee Application. Such practices include where services are "lumped" together, *In re Blackwood Assocs.*, 165 B.R. 108, 113 (Bankr.E.D.N.Y.1994); or where no task is billed at less than twelve minutes, *Matter of Cena's Fine Furniture, Inc.*, 109 B.R. at 584; or where all tasks are billed in even increments, *id.* Based on the entire record, the Court finds that the hours expended by Mr. Aab for the tasks performed are reasonable.

*The Reasonableness of the Rate*

 The reasonableness of the hourly rate is determined by considering " 'that fee which is customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results.' " *In re*

*Navis Realty, Inc.,* 126 B.R. 137, 140 (Bankr.E.D.N.Y.1991), *quoting In re Shades of Beauty,* 56 B.R. 946, 951 (Bankr. E.D.N.Y.1986), *aff'd,* 95 B.R. 17 (E.D.N.Y. 1988). Here, Mr. Aab seeks compensation based on a rate of $325 an hour, representing approximately a fifteen percent reduction from his usual rate of $375 per hour. *See* Fee Application ¶ 6. Notably, neither the Debtor nor the United States Trustee has objected to the reasonableness of Mr. Aab's proposed hourly rate. And the Court notes that it is well within the range of reasonableness for rates for attorneys of comparable skill and experience. *See, e.g., In re Dragone,* 324 B.R. 445, 447 (Bankr. D.Conn.2005) (the creditor's attorney's fee of $300 per hour was reasonable, and less than the objecting debtor's attorney's fee of $345 per hour). The history of this case shows that several novel and complex legal and transactional issues arose and were addressed, the protection of the automatic stay was maintained, and conversion to a case under Chapter 7 was avoided. Based on the entire record, in light of Mr. Aab's experience and expertise and in consideration of the novel and complex issues in this case and the results achieved, the Court finds that a fee of $325 per hour is reasonable.

### The "Lodestar" Calculation

As described above, the Court finds that the Fee Application adequately documents and supports Mr. Aab's request for compensation for 560.3 hours of attorney time at an hourly rate of $325. *See* pp. 766–767, *supra.* Based on the entire record, and applying the "lodestar" methodology, the Court concludes that Mr. Aab has shown that he is entitled to an award of $182,097.50 in fees as "reasonable compensation for actual, necessary services" in this case.

### Additional Compensation Requested

The Fee Application seeks compensation for fifteen unrecorded hours, and nine hours recorded by another attorney, George Mayer, who is not associated with Mr. Aab. *See* Fee Application ¶ 13. The Fee Application also requests a $25,000 bonus for Mr. Aab in recognition of the "difficulty of this case and the excellent results attributable to applicant's efforts." Fee Application ¶ 14.

As to the request for compensation for fifteen unrecorded hours, the Second Circuit has found that, as a general rule, uncertainties due to incomplete or otherwise inadequate record-keeping will be resolved against the applicant. *See New York Ass'n for Retarded Children v. Carey,* 711 F.2d at 1142, 1146; *see also In re Poseidon Pools of America,* 216 B.R. 98, 100 (E.D.N.Y.1997). Accordingly, this request will be denied.

As to the request for compensation for Mr. Mayer, Section 330 of the Bankruptcy Code permits compensation only for those professional persons, including attorneys, who were retained with the approval of the Court pursuant to Sections 327 or 1103. 11 U.S.C. § 330(a)(1). Since Mr. Mayer's retention was not the subject of an application to the Court and did not receive Court approval, he is not eligible for compensation by the estate under Section 330. 3 COLLIER ON BANKRUPTCY ¶ 330.03[a] at 330–24 (15th ed.1995). Accordingly, this request will also be denied.

Finally, as to Mr. Aab's request for a bonus, the United States Supreme Court has held that upward adjustments of the "lodestar" amount are "proper only in certain 'rare' and 'exceptional' cases." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. at 565, 106 S.Ct. 3088, *quoting Blum v. Stenson,* 465 U.S. 886, 899, 104

S.Ct. 1541, 79 L.Ed.2d 891 (1984). *See also In re Poseidon Pools of America,* 216 B.R. at 100; *Matter of Cena's Fine Furniture, Inc.,* 109 B.R. at 581. A bonus may be appropriate where, for example, the amount yielded by the "lodestar" calculation does not adequately compensate the applicant because the case was concluded in an exceedingly brief period of time, or more generally, because the hours recorded do not fully reflect the value of the services or the outcome achieved. *See Blum v. Stenson,* 465 U.S. at 897–98, 104 S.Ct. 1541.

Here, the record shows that this is not a case that was concluded in an exceptionally short period, or a case where the "lodestar" calculation leads to unreasonably low or objectively inadequate compensation. In addition, the record suggest that other factors, including market forces and the booming real estate economy in New York, figured in the prospect of a favorable outcome. *See* UST Statement at 6–7. Further, Mr. Aab's involvement in the sale transaction was not substantial, and he withdrew from the representation of the Debtor before the sale was consummated. *See* Fee Application ¶¶ 7, 9, and Exhibit E. For all of these reasons, and based on the entire record, the Court finds that a bonus is not warranted in this case.

*Reasonable Reimbursement of Actual and Necessary Expenses*

 Section 330 of the Bankruptcy Code authorizes reimbursement of attorneys for actual and necessary expenses. 11 U.S.C. § 330(a)(1)(B). Requests for reimbursement of expenses must be supported by documentation. UST Guidelines (b)(5). Expenses are considered "actual" if they are in fact incurred rather than constructively incurred based on a *pro rata* allocation, a formula, or estimation. *See In re S.T.N. Enter., Inc.,* 70 B.R. 823, 834 (Bankr.D.Vt.1987) ("An attorney,

claiming reimbursement from the estate for expenses incurred in the case must likewise furnish enough specificity for the Court to establish whether a given expense was both actual and necessary"). "Only fully documented, actual, out-of-pocket expenses will be reimbursed." *Id.* An expense is considered necessary where it was "reasonably needed to accomplish proper representation of the client." *In re Pacific Express, Inc.,* 56 B.R. 859, 865 (Bankr. E.D.Cal.1985). *See also In re American Preferred Prescription, Inc.,* 218 B.R. 680, 686–87 (Bankr.E.D.N.Y.1998) (expense is necessary if incurred to accomplish proper representation). As with requests for compensation, the Court should consider whether the expenses were necessary to the administration of the estate, beneficial to the estate at the time they were incurred, and reasonably likely to benefit the estate. *See* 11 U.S.C. § 330(a)(1). And as with requests for compensation, an objective standard should apply and "20/20 hindsight" should not be invoked to penalize the applicant. *See* p. 767, *supra.* In short, an award of expenses is determined according to substantially the same criteria and standard of reasonableness that apply to an award of attorney's fees. *See In re Specialty Plywood, Inc.,* 160 B.R. 627, 632 (9th Cir. BAP 1993); 3 COLLIER ON BANKRUPTCY ¶ 330.05[1] at 330–61 (15th ed.1995).

 Although courts differ on whether particular expenses, such as photocopying or local travel, are reimbursable, expenses that are part of the "day-to-day operating costs" of the attorney's business are considered overhead and should not be paid for by the estate. *In re Island Helicopter Corp.,* 53 B.R. 71, 72 (Bankr. E.D.N.Y.1985), *citing In re Thacker,* 48 B.R. 161, 164 (Bankr.N.D.Ill.1985). To be reimbursable, expenses must be attributable to a particular client and matter. *In re Island Helicopter Corp.,* 53 B.R. at 73,

*citing In re Thacker,* 48 B.R. at 164. The UST Guidelines identify several factors as indicative of the reasonableness of expenses, including whether the expense is economical rather than extravagant; whether it is customarily charged to the applicant's non-bankruptcy clients; whether the applicant has provided a detailed itemization; whether the applicant has pro-rated expenses between the estate and other cases where appropriate; and whether expenses are limited to the actual cost incurred. UST Guidelines (b)(5).

Mr. Aab seeks reimbursement of $4,199.14 in expenses. This figure includes photocopying charges of $1,768.30 (at twenty cents per page), filing and court fees of $1,289, local travel charges of $84 (at four dollars per trip), the cost of a rental car to Hackensack, New Jersey at $83.37, postage charges of $341.99, express mail charges of $287.48, scanning charges of $45, and interpreter services of $300. The record shows that the expenses for which reimbursement is requested are attributable to the Debtor's case and documented with specificity, were actual and necessary at the time that they were incurred, were economical rather than extravagant, and otherwise meet the UST Guidelines requirements. In addition, they are not objected to by the United States Trustee or the Debtor. For all of these reasons and based on the entire record, the Court finds that Mr. Aab's request for reimbursement of $4,199.14 in expenses is reasonable.

*The Debtor's Objections*

As noted above, the Debtor submitted the affidavit of Mr. Kim, the principal of the Debtor, sworn to on October 5, 2005, and also signed by Mr. Lee, in opposition to the Fee Application. *See* p. 765, *supra.* The Debtor objects to the Fee Application in its entirety. *See* Debtor's Opposition ¶ 39. The Debtor states that "[d]uring the

course of his representation, Mr. Aab's interest steadily turned from protecting the Debtor's interest to preserving his claim for the legal services" and that Mr. Aab "was more of a hindrance rather than a help . . . part of the problem rather than a solution and, in the opinion of the Debtor, a reason why this case dragged on for so long." Debtor's Opposition ¶ 2. In particular, the Debtor identifies six events to argue that Mr. Aab is not entitled to a fee or reimbursement of expenses for his work in this case.

*The Proposed HMC Refinancing Transaction*

The Debtor argues that Mr. Aab prevented the Debtor from entering into a lease with K–Nine Solutions, and as a result, the HMC Proposal fell through. Debtor's Opposition ¶¶ 3–9. Mr. Kim avers that Mr. Aab was "trying his best to kill this deal." Debtor's Opposition ¶ 4. But the record shows that K–Nine Solutions was willing to rent only 7,500 square feet in the Property, while the HMC Proposal required the Property to be fully leased. *See* Lease Motion ¶¶ 5–6. *See also* UST Statement at 2–3. Thus, even if the Debtor had entered into that lease, it would not have been in a position to proceed with the HMC Proposal. In addition, Mr. Aab's time records indicate that on several occasions, he attempted to obtain necessary documents and funds from K–Nine Solutions in order to enter into a lease, and that K–Nine Solutions ultimately withdrew because it did not want to post the funds that HMC required. *See* Fee Application Exhibit E (entries for June 25, 2004; June 26, 2004; July 2, 2004; July 7, 2004; July 15, 2004; July 17, 2004; July 19, 2004; and July 26, 2004). Thus, the record does not support the Debtor's assertion that "by May, 2004 Aab ha[d] already made a determination that he [was] not going to allow any refinancing or re-

structuring of the Debtor's debts but force the Debtor to sell the Building." Debtor's Opposition ¶ 9. For these reasons, and based on the entire record, the Court finds that the circumstances of the proposed HMC refinancing are not a reason to deny the Fee Application.

*The Proposed ESB Refinancing Transaction*

▮ The Debtor argues that due to the fact that Mr. Aab departed on vacation at the time of a closing of the proposed ESB refinancing transaction that was scheduled for August 30, 2004, the Debtor could not close. *See* Debtor's Opposition ¶¶ 11–13. The Debtor further asserts that the Debtor was not able to satisfy ESB's demands to extend its commitment, and as a result, the ESB Proposal fell through. *See* Debtor's Opposition ¶¶ 14–16.

The record does not support the Debtor's assertion that it was ready, willing, and able to close on the proposed ESB refinancing transaction in late August 2004. Two letters from Michelle Feeney, the mortgage broker for the transaction, filed with the Court on August 23, and August 25, 2004, indicate that a closing was planned for September 2, 2004, but that certain necessary items, including a final inspection and an updated payoff letter, were still outstanding. Docket Entries 63, 64. The record also shows that Mr. Aab billed time on twenty-one days between August 15, 2004, and September 15, 2004, around the time of the first projected closing date. *See* Fee Application, Exhibit E, pp. 16–19. And the Debtor acknowledges that it was not able to come up with the additional $150,000 reserve required by ESB after the initial commitment expired. *See* Debtor's Opposition ¶ 15. Finally, the record shows that negotiations between ESB and the Debtor continued into December 2004. *See* Letter Advising Supplemental Technical Revision to Nara Bank's Proposed Counter–Order, dated December 7, 2004, Docket Entry 82 (describing negotiations with ESB counsel). The United States Trustee notes that the record does not support the Debtor's version of the ESB refinancing transaction timeline, stating that "at a minimum, the Principal is collapsing events that occurred over several months in to a period of a few weeks, or has confused his dates." UST Statement at 3. For these reasons, and based on the entire record, the Court finds that the circumstances of the proposed ESB refinancing transaction are not a reason to deny the Fee Application.

*The Proposed Leases Procured by Greiner–Maltz Co., Inc. for the Property*

▮ The Debtor argues that Mr. Aab unreasonably refused to seek approval of two proposed leases procured for the Debtor by Greiner–Maltz Co., Inc. ("Greiner–Maltz"), a commercial real estate broker. Debtor's Opposition ¶¶ 21–25. The record reflects that the Debtor applied to the Court for permission to retain Greiner–Maltz. *See* Application to Employ Real Estate Broker dated March 11, 2004, Docket Entry 27; UST Statement at 4–5. That application was heard by the Court on May 4, 2004, and was withdrawn at that hearing. *See* May 4, 2004, Docket Entry. Testimony at the May 4, 2004, hearing suggested the possibility of a conflicting financial arrangement between the broker and Mr. Kim. *See* UST Statement at 5; *see also* Opposition to Debtor's Application Seeking to Retain Greiner–Maltz as Debtor's Exclusive Real Estate Broker, Docket Entry 28. Since the Debtor never retained Greiner–Maltz, and withdrew its application to do so, it could not have been in a position to seek approval of and enter into any leases procured by Greiner–Maltz. For these reasons, and based on the entire record, the Court finds that the circum-

stances of the proposed leases procured by Greiner–Maltz for the Property are not a reason to deny the Fee Application.

### The Proposed KFI Refinancing Transaction

The Debtor argues that the terms of the KFI Proposal were "so horrendous that Aab should not have even introduced [the KFI Proposal] into the picture," and that the proposed KFI refinancing transaction "would have put the Debtor only deeper into debt." Debtor's Opposition ¶¶ 27–28. But the Debtor does not argue that Mr. Aab had any financial or other interest in the transaction, or explain why Mr. Aab, as counsel for the Debtor, had a duty or obligation to dissuade the Debtor from pursuing the KFI Proposal. In addition, while the Debtor strenuously objects to the reasonableness of the terms of the KFI Proposal in its opposition to the Fee Application, the Debtor takes a different tack in its opposition to KFI's application for an order directing the Debtor to satisfy its lien, filed after the Debtor's Opposition to the Fee Application. In the Affidavit of Kyo Jong Kim in Opposition to Motion by Kennedy Funding, Inc., dated October 17, 2005 (the "Debtor's Opposition to KFI Application"), Mr. Kim describes many attempts he personally made to consummate the deal with KFI, and asserts that they were inappropriately rebuffed by KFI. Debtor's Opposition to KFI Application ¶¶ 3–39. As a whole, the Debtor's Opposition to KFI Application, which is Mr. Kim's sworn statement, portrays the Debtor, and Mr. Kim personally, as both knowledgeable about, and eager to enter into, the KFI Proposal, and does not mention Mr. Aab's role in the process. For these reasons, and based on the entire record, the Court finds that the circumstances of the KFI Proposal are not a reason to deny the Fee Application.

### Mr. Aab's Request for a $50,000 Deposit

The Debtor argues that Mr. Aab requested, by letter dated February 7, 2005, that $50,000 be held in escrow as a deposit toward his legal fees and disbursements (the "February 7 Letter"). See Debtor's Opposition ¶ 33 and Exhibit D. The Debtor further states that an "inference can be made from this letter that the legal fees amounted to less than $50,000 as of the date of this letter." Debtor's Opposition ¶ 34. The Court finds no support for such an inference and, in all events, even if such an inference were justified it would not alter the Court's conclusions with respect to the adequacy of the records maintained by Mr. Aab, the reasonableness of the hours expended, or the reasonableness of the rate. See pp. 766–768, supra. For these reasons, and based on the entire record, the Court finds that the circumstances reflected in the February 7 Letter are not a reason to deny the Fee Application.

### Failure To Pursue a Collection Action Against a Former Tenant

The Debtor argues that Mr. Aab unreasonably failed to take legal action against the Debtor's former tenant, Dough Boy Donuts, Inc., to collect unpaid rent. Debtor's Opposition ¶¶ 36–38. The record shows that over a period of almost six months, Mr. Aab addressed this matter on at least eight separate occasions, as reflected by his time records. See Fee Application Exhibit E (entries for Feb. 24, 2004; Mar. 27, 2004; Apr. 19, 2004; Apr. 29, 2004; May 13, 2004; May 16, 2004; July 8, 2004; and Aug. 2, 2004). And the record does not show that the Debtor's new counsel has proceeded any differently with respect to this matter. For these reasons, and based on the entire record, the Court finds that the circumstances of the legal action against Dough Boy Do-

nuts, Inc. are not a reason to deny the Fee Application.

### *Conclusion*

On the Fee Application of Raymond J. Aab, the Court concludes that pursuant to Section 330 of the Bankruptcy Code, Mr. Aab is entitled to compensation for actual and necessary services rendered in the amount of $182,097.50 and reimbursement of expenses in the amount of $4,199.14. The Court also concludes that Mr. Aab is not entitled to compensation for his unrecorded time or for the time recorded by Mr. Mayer. The Court further concludes that Mr. Aab is not entitled to a bonus. Finally, the Court concludes that the Debtor should be directed to pay Mr. Aab $171,296.64 representing attorney's fees of $182,097.50 and expenses of $4,199.14, reduced by the $15,000 retainer paid to Mr. Aab by the Debtor. An Order in accordance with this Memorandum Decision will be entered simultaneously herewith.